Argued and submitted March 6, convictions on Counts 2 and 3 vacated and remanded for further proceedings; otherwise affirmed June 18; appellant's petition for reconsideration filed July 3, respondent's response to petition for reconsideration filed July 24, and appellant's reply to respondent's response to petition for reconsideration filed July 31, allowed by opinion October 1, 2014
See 265 Or App 742, 338 P3d 160 (2014)

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## JEFF EDWARD LAMBERT,
*Defendant-Appellant.*

Multnomah County Circuit Court
111034516; A151279

328 P3d 824

Zachary Lovett Mazer, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Anna M. Joyce, Solicitor General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Michael R. Salvas, Assistant Attorney General.

Before Ortega, Presiding Judge, and DeVore, Judge, and Garrett, Judge.

GARRETT, J.

## GARRETT, J.

A jury convicted defendant of two counts of burglary in the second degree, ORS 164.215, and two counts of criminal mischief in the first degree, ORS 164.365. On appeal, defendant assigns error to the denial of his motions to suppress evidence obtained after police searched his vehicle. Defendant argues that the vehicle was illegally seized when police, acting without a warrant, towed the vehicle to an impound lot; defendant argues further that the warrant that police later relied upon to search the vehicle was issued without probable cause. Defendant also assigns error to the denial of his motion for a judgment of acquittal on the burglary charges, arguing that the state failed to establish that he entered a "building" within the meaning of ORS 164.215.

For the reasons that follow, we agree with defendant that the warrantless tow of his vehicle was unlawful because the state failed to show that the "administrative seizure" exception to the warrant requirement applied in this case. The trial court therefore erred in denying the motion to suppress on that basis. We remand, however, in order for the trial court to determine whether, as the state argues, the evidence that defendant sought to suppress would have been discovered regardless of the illegal seizure. Separately, we reject defendant's arguments that the search warrant was based on "stale" information and that he did not enter a "building" for purposes of the burglary statute.

## I. BACKGROUND

The Portland Water Bureau (PWB) owns a facility on Northeast Airport Way in Portland. The property is enclosed by a chain-link fence and contains, among other things, several permanent buildings, a shipping container, and a groundwater pumping station that provides backup water supply for the City of Portland. The site is adjacent to a piece of publicly accessible property that includes a nature path, a boat launch, and a parking area.

At all relevant times, PWB was leasing part of the Airport Way facility to a private company, Carollo Engineers (Carollo), for the purpose of conducting tests on water treatment systems. Carollo did not use any of the permanent

buildings at the site; rather, its employees worked in large tents, which were described at trial as the type of "party tents" that "you might see out at a waterfront event." The tents had roofs and waterproof canvas walls around all four sides. Workers entered and exited though flaps on the walls. The tents were temporary structures that were erected for periods ranging from six weeks to nine months.

When in use, the tents would function as a temporary testing facility, housing various pieces of equipment used to monitor water quality and power usage. The tents protected piping through which employees could access and test the water. Engineers also placed a work bench inside the tents. At the end of the work day, smaller, portable items would be locked in the shipping container outside the tents; larger items were left in the tents, including the water treatment equipment and control systems being tested.

In August 2011, there was a break-in at the PWB property. Carollo employees arrived at work to discover that the lock on the shipping container had been broken and several items had been removed from the container. A toolbox had been opened and its contents scattered about one of the tents. A chlorine kit and a pH pen[1] were missing from the toolbox. Employees then observed that a hole large enough to drive a car through had been cut into a section of the perimeter fence. Investigating the scene later that morning, Portland police discovered a "4x4" decal, which appeared to have become detached from a vehicle, lying on the ground near the hole in the fence.

A second break-in occurred at the PWB facility on the night of October 14, 2011. That time, PWB security observed a vehicle parked just outside the PWB site, on the adjacent public property, near the perimeter fence. They also observed an unknown person moving inside one of the tents. Portland police responded to the scene. The vehicle, a Jeep Grand Cherokee, appeared to have been driven through the parking lot for the boat launch and onto a grassy area so that it was concealed behind a row of trees. Police also found

---

[1] At trial, a Carollo engineer explained that a pH pen is "a little hand-held device" that allows a person to "quickly and relatively cheaply measure the pH of the water."

that the lock on the PWB facility gate had been cut. Police observed defendant walk into one of the tents and eventually approach the fence. Defendant was arrested.

Defendant was carrying a bag containing a pipe wrench, a flashlight, and bolt cutters. He did not have any property on his person that belonged to PWB or Carollo. Defendant told police that the Jeep was his, but he refused to consent to a search of the vehicle.

After defendant was taken from the scene, police observed that the Jeep's rear seats were folded down and covered by a blanket. Officer Parry then called a towing company to remove the vehicle. During a pretrial hearing on defendant's motion to suppress, the state questioned Parry about the decision to tow the vehicle:

"[THE STATE:]   Did you believe that that car contained or could contain any criminal evidence?

"[PARRY:]   Yes, I did believe that.

"[THE STATE:]   All right. And in—so this car's parked sort of offset from a parking lot. As an officer, what are your options for getting that vehicle out of there?

"[PARRY:]   I didn't try—I mean, I didn't have a key for the vehicle so I couldn't drive it out and that's not an option. I don't drive other people's vehicles. So the option that we have as law enforcement is to tow the vehicle.

"[THE STATE:]   Were you aware of any other reasonable disposition for that vehicle available to you at that time besides towing?

"[PARRY:]   No, I was not.

"[THE STATE:]   All right. And where that car was parked, to the best of your recollection, was it blocking anything or interfering with the use of that parking lot or was it just sort of off to the side?

"[PARRY:]   No, it was off to the side, up against the fence.

"[THE STATE:]   All right. And was the car, in fact, towed?

"[PARRY:]   Yes, it was."

The Jeep was taken to the police impound lot, a secure facility where police send cars "as a matter of course." Parry also

put a "hold" on the vehicle, which served the purpose of notifying the police bureau's burglary task force so that they would "eventually look at the vehicle."

The same night that defendant was taken into custody, he was interviewed by Officer Lobaugh, a member of the burglary task force, at the Southeast precinct. Defendant admitted to cutting the lock on the perimeter fence and breaking into the PWB property that night. Defendant explained, "I had some bad luck at the poker machine and I needed some money, so I thought I'd get some scrap metal and turn it in and get some money." He said he had been at the site for only about five minutes before police arrived. Defendant denied any involvement in the August break-in. Lobaugh asked about the 4x4 decal that police had found at the scene of the August break-in; defendant replied that it could not have come from his Jeep because it did not have those types of decals.

Four days after the interview, Lobaugh took the 4x4 decal to the vehicle impound lot. Upon examining the exterior of defendant's Jeep, Lobaugh discovered that it appeared to be missing a decal, and that the decal from the scene of the August break-in "fit [the Jeep] like a puzzle."

Lobaugh applied for a warrant to search defendant's Jeep. In his supporting affidavit, Lobaugh stated that police at the scene of the August break-in had discovered a hole in the fence "large enough to allow a vehicle to drive through"; that forensic specialists identified "indistinct tire tracks visible on the ground, leading from a perimeter path through the hole in the fence"; and that police found "a plastic 4x4 vehicle decal that had possibly been scraped off the side of a vehicle." Describing the October break-in, Lobaugh stated that defendant had been driving a "Jeep Cherokee" and had "made entry into the property by cutting though the fence"; that police observed blankets in the rear of defendant's vehicle that were "clearly" concealing something from view; and that when Lobaugh compared the 4x4 decal that had been recovered in August with the spot on defendant's vehicle that appeared to be missing a decal, "[t]he glue to where the decal had been was still obvious and the decal seemed to fit exactly to that spot." Lobaugh requested a warrant

to search and seize items "to include, but not limited to the items reported stolen in the theft in [the A]ugust case." The affidavit then listed a number of stolen items, including water and electrical testing equipment, two laptops, "[m]iscellaneous tools," and a "[p]H pen (red in color, handheld)." The warrant was issued; police discovered a red pH pen in defendant's vehicle that was identical to the type of pen stolen in the August break-in.

Before trial, defendant filed a motion "for an Order suppressing evidence arising out of the search, pursuant to a search warrant, of [defendant's] 1992 green Jeep Cherokee * * *." Defendant argued, as pertinent on appeal, that the information in Lobaugh's affidavit was too "stale" to establish the probable cause necessary to support issuance of the warrant. Subsequently, defendant filed a second motion to suppress "all evidence discovered pursuant to the warrantless and unlawful 'seizure'" of his vehicle. At a hearing, defendant argued that

"because of the fact that they were applying for a warrant, they had the owner in custody and it wasn't impeding or blocking any traffic, and we have no evidence that it was illegally parked, therefore, the seizure and towing of this vehicle prior to getting the warrant was illegal. And therefore, the subsequent execution of the warrant and the search must be suppressed."

The trial court denied both motions. As to the seizure of the Jeep, the trial court determined that police had authority to tow the vehicle under Portland City Code (PCC) 16.30.220:

"[T]he court * * * finds that the City of Portland Code did provide the officer with a legal basis to tow the vehicle without prior notice.

"And there's really two bases in that, the Code, under subparagraph G and H here, based on the facts in the record here. So the court finds that it's appropriate to deny the motion to suppress here."[2]

---

[2] PCC 16.30.220 provides, in part,

"Any authorized officer may, without prior notice, order a vehicle towed, when:
"* * * * *

  In further colloquy with the court, defendant questioned how the seizure could be justified when the state had not produced any "evidence that shows that [the Jeep] was obstructing traffic or a danger or anything like that." Defendant argued that under those circumstances a warrant was required. The following exchange then occurred:

"THE COURT: * * * [PCC 16.30.220(H) applies when] the vehicle's in possession of a person taken into custody and there's no other reasonable disposition of the vehicle is available.

"So what you're saying is it's more reasonable to just leave the vehicle out there.

"[DEFENDANT]: Yes.

"THE COURT: By itself.

"[DEFENDANT]: Yes.

"THE COURT: And then you'd have some claim by the person, well, you hauled me away and my vehicle was left out there and then someone came along and busted out all the windows and vandalized it and it's all your fault.

"[DEFENDANT]: I mean, that's a different issue.

"THE COURT: Well, but that goes into is that a reasonable disposition of the vehicle for law enforcement to—to arrest the person, haul them away, and leave the person's vehicle out there in, you know, a place—

"[DEFENDANT]: Then get the search warrant right away.

"THE COURT: Well—

"[DEFENDANT]: I mean, really, if it's—if it's that pressing, they can call in a search warrant immediately. They can be granted by phone."

The court stood by its original ruling denying the motion to suppress.

---

"G. A police officer reasonably believes that the vehicle or its contents constitute evidence of any offense, if such towing is reasonably necessary to obtain or preserve such evidence;

"H. The vehicle was in possession of a person taken into custody by a law enforcement officer and no other reasonable disposition of the vehicle is available[.]"

At the conclusion of the evidence, defendant moved for a judgment of acquittal on the two burglary charges. Defendant argued, among other things, that the state had failed to prove the necessary element that defendant "enter[ed] or remain[ed] unlawfully in a building." *See* ORS 164.215. The tents at the PWB facility, defendant argued, did not constitute "buildings" within the meaning of the statute. The trial court denied defendant's motion.

## II. DISCUSSION

On appeal, defendant assigns error to the denial of his motion to suppress all evidence discovered pursuant to the warrantless seizure of his Jeep, the denial of his motion to suppress the evidence discovered during the warranted search of his Jeep, and the denial of his motion for a judgment of acquittal on the two burglary charges.

### A. *Motion to Suppress: Warrantless Seizure*

Regarding his motion to suppress the evidence obtained pursuant to the warrantless seizure, defendant argues: (1) that the tow of his Jeep from the scene was an illegal warrantless seizure; (2) that that illegal seizure resulted in Lobaugh's inspection of the Jeep and the connection to the 4x4 decal found at the August break-in; and (3) that, without that connection, Lobaugh's affidavit would not have established probable cause to support issuance of the search warrant. Accordingly, defendant argues, both the pH pen and the "evidence of the 'match' between the '4x4' logo and defendant's Jeep" must be suppressed. As explained below, we agree with defendant that the warrantless seizure of the vehicle was illegal because the state failed to show that the "administrative seizure" exception applies. That does not necessarily mean, however, that the evidence resulting from the *warranted search* of the Jeep must be suppressed. That issue requires further findings on remand.

It is undisputed that police "seized" defendant's Jeep when they ordered it towed and that the seizure occurred without a warrant. Therefore, we begin our analysis with the basic proposition that, under Article I, section 9, of the Oregon Constitution, warrantless seizures are *per se* unreasonable unless they fall within "one of the few 'specifically

established and well-delineated exceptions' to the warrant requirement."[3] *State v. Davis*, 295 Or 227, 237, 666 P2d 802 (1983); *Katz v. United States*, 389 US 347, 357, 88 S Ct 507, 19 L Ed 2d 576 (1967)). The state has the burden of showing that circumstances existing at the time of the warrantless seizure allow the state to "invoke one of these exceptions." *Id.*

At the outset, we note that the state's arguments on appeal are confined to PCC 16.30.220(H). Accordingly, we limit our analysis to subsection (H).

By defending the tow under subsection (H), which provides that an officer may "without prior notice, order a vehicle towed, when: * * * [t]he vehicle was in possession of a person taken into custody by a law enforcement officer and no other reasonable disposition of the vehicle is available," the state relies upon the "administrative seizure" exception to the warrant requirement. That exception recognizes that police have occasions to take custody of personal property for reasons that are unrelated to any criminal investigation. In such cases, police "have an administrative or civil duty, authority or responsibility to take custody of personal property." *State v. Atkinson,* 298 Or 1, 8, 688 P2d 832 (1984) (discussing a statute authorizing police to take custody of "abandoned" vehicles).

An "administrative seizure" is often followed by an "inventory search," a term that has emerged in our case law to describe a police department practice of examining and cataloguing property that is taken into administrative custody. The concepts of an administrative seizure and an inventory search are thus related, but distinct. In order to comply with the constitution, an inventory search must satisfy three requirements:

> "(1) the state must lawfully possess the property that is inventoried, (2) the inventory 'must be conducted pursuant to a properly authorized administrative program, designed and systematically administered so that the inventory involves no exercise of discretion by the law enforcement

---

[3] Article I, section 9, provides, in part, "No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]"

person directing or taking the inventory,' and (3) the person directing or taking the inventory must not deviate from the established policy or procedures."

*State v. Stinstrom,* 261 Or App 186, 190, 322 P3d 1076 (2014) (quoting *Atkinson,* 298 Or at 8-10).

An administrative seizure, too, must be "specifically authorized" by law. *State v. Anderson,* 101 Or App 594, 597, 792 P2d 451 (1990). Unlike with inventory searches, police are allowed to use discretion when deciding whether to carry out an administrative seizure. *State v. Gaunce,* 114 Or App 190, 195, 834 P2d 512, *rev den,* 351 Or 271 (1992). In exercising that discretion, however, an officer's suspicion of criminal activity "can play no part" in the decision. *Id.* That is so because, "[i]f suspicion of criminal activity affects the decision to impound a car, and an inventory follows, then the decision to impound the car effectively singles out the car for special searching attention." *Id.* (citing *Atkinson,* 298 Or at 10 n 5) (brackets and quotation marks omitted). In other words, without that rule, the state could easily circumvent the "no exercise of discretion" requirement for inventory searches. Accordingly, if an officer who conducts a warrantless "administrative" seizure also subjectively believes that the seized property may contain evidence of a crime, the state must prove that the property would have been seized regardless of the officer's suspicion of criminal activity. *Gaunce,* 114 Or App at 194-96.

Our decision in *State v. Penney,* 252 Or App 677, 288 P3d 989 (2012), is instructive regarding the state's burden in administrative seizure cases. In *Penney,* the defendant filed a motion to suppress evidence discovered after police impounded and performed an inventory search on his car. *Id.* at 681. Although the trial court concluded (erroneously[4]) that the city ordinance authorizing the car to be towed was constitutionally defective because it allowed for too much discretion on the part of the police, the court further ruled that suppression was not required because "the car was parked in a manner that impeded traffic *and, therefore,* the officers

---

[4] The trial court in *Penney* erred in applying a "no-discretion" requirement to administrative seizures. As explained above, that requirement exists for inventory searches, not administrative searches. *Gaunce,* 114 Or App at 195.

would have ordered a tow and the inventory would have occurred regardless." *Id.* (emphasis added). On appeal, the defendant argued that the trial court erred because, among other reasons, the officer's decision to order the defendant's vehicle towed "was motivated by a desire to search the vehicle." *Id.* at 684.

In addressing that argument, we reached several conclusions that are relevant here. First, relying on *Gaunce* and *Atkinson*, we explained that the fact that an officer "suspects criminal activity * * * when deciding whether to impound a car" is not dispositive. *Penney*, 252 Or App at 685. Rather, the relevant inquiry is whether "an officer's decision to impound a vehicle was *influenced* by a desire to search" it for evidence of a crime. *Id.* at 686 (emphasis added). Second, we concluded that answering that question requires "a factual determination." *Id.* We will defer to a trial court's factual findings unless the evidence supporting those findings is "insufficient to meet constitutional standards of due process." *Ball v. Gladden*, 250 Or 485, 487-88, 443 P2d 621 (1968). Finally, we concluded in that case that the trial court "implicitly found that the officers did not impound defendant's car because of a desire to search it." *Penney*, 252 Or App at 686. That conclusion was based on our observation that, in the course of deciding that suppression was not required, the trial court found as fact that "the manner in which the vehicle was parked (or more accurately, stopped) left it in a location where it was an impediment to traffic." *Id.* That is, "given the hazard that the car created, the [trial] court found that the officers would have ordered it towed regardless" of their suspicions. *Id.* That finding was "supported by the testimony of the officers who stated that they made the decision to tow defendant's car because of 'no insurance' and because 'it presented a hazard in the roadway.'" *Id.*

In *Gaunce*, in contrast, the trial court made a finding that "*the main reason* [that police] decided to have the car towed was that it was creating a potential traffic hazard." 114 Or App at 195 (emphasis in original). On appeal, the state argued that the trial court had thus "implicitly found * * * that the car would have been towed [independent of] any suspicions" of criminal activity. *Id.* (quotation marks

omitted; brackets and ellipses in original). We disagreed, reasoning that the trial court's finding left open the "dispositive factual issue," which was whether the officer in question "would have had [the] defendant's car impounded, regardless of his suspicions" about criminal activity. *Id.* at 196. We concluded that the correct disposition was to "vacate defendant's conviction and remand with instructions to make a finding on the existing record" and, if the court made that finding in defendant's favor, to "allow defendant's motion to suppress and * * * order a new trial." *Id.*

In the case before us, the state argues that the impoundment of defendant's Jeep was a lawful administrative seizure because "all the elements" of PCC 16.30.220(H) were met, *viz.*, the Jeep was "in possession" of a person, defendant, who was "taken into custody by a law enforcement officer," and "no other reasonable disposition of the vehicle" was available. Defendant counters that the state's administrative seizure rationale is inapplicable because "the sole reason for towing and impounding defendant's Jeep was to search it for criminal evidence and because no other concurrent administrative purpose justified the tow."

We conclude that the state failed to carry its burden of showing that the circumstances allowed police to invoke the administrative seizure exception to the warrant requirement.

Contrary to the state's argument on appeal, the warrantless seizure of defendant's vehicle cannot be justified by reference to the Portland ordinance alone. If police impound a vehicle without a warrant because they believe that it contains evidence of a crime, that raises a constitutional problem that cannot be cured by referring to a city code or by characterizing the seizure as "administrative." The administrative seizure exception applies when the seizure is "specifically authorized by law," *Stinstrom*, 261 Or App at 190, *and* suspicions of criminal activity "play no part" in the officer's decision to seize the property. *Gaunce*, 114 Or App at 195.

The state contends that the tow was authorized by law because subsection H allows a tow where no other "reasonable disposition" is available, and Parry testified that he

was not aware of any "reasonable disposition" other than towing. But the record does not support a conclusion that any "disposition" by the police was even necessary in this case. Unlike in *Penney*, there is no indication that defendant's Jeep was obstructing traffic or otherwise creating a hazard. Rather, the Jeep was parked on a piece of accessible public property near a nature trail and a boat launch. It apparently was outside the designated parking area, but there is nothing in the record (*e.g.*, evidence of a posted sign restricting parking to designated areas or certain hours) from which a finder of fact could infer, from that fact alone, that a tow would have resulted.

The state also relies on the colloquy between the trial court and defense counsel, during which the trial court opined that if police had left the Jeep where it was, they might have risked being liable for any damage that came to it. But there was no testimony on that score; Parry never testified that the decision to impound defendant's vehicle was based, for example, on concerns about break-ins or vandalism. *Compare State v. Oneill*, 251 Or App 424, 428, 285 P3d 1127, *rev den*, 352 Or 665 (2012) (holding that the warrantless removal of a vehicle was reasonable in light of "evidence that the car, although not presenting an impediment or hazard to other vehicles, was parked in a high-crime area known for vehicle break-ins" and that "[t]he car contained a number of pieces of property, some of them valuable").[5]

In short, Parry testified that he ordered the Jeep towed because he believed that it contained evidence and

---

[5] *Oneill* involved an exception to the federal warrant requirement, the "community caretaking" exception, which recognizes that police perform certain public services that are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski*, 413 US 433, 441, 93 S Ct 2523, 37 L Ed 2d 706 (1973). Thus, for example, the community caretaking exception allows police to "impound vehicles that jeopardize public safety and the efficient movement of vehicular traffic" without first obtaining a warrant. *State v. Oneill*, 251 Or App 424, 427, 285 P3d 1127 (2012) (quoting *Miranda v. City of Cornelius*, 429 F3d 858, 864 (9th Cir 2005)). Whether the community caretaking doctrine applies in such situations "depends on the location of the vehicle and the police officers' duty to prevent it from creating a hazard to other drivers or being a target for vandalism or theft." *Miranda*, 429 F3d at 864. Therefore, whether the community caretaking exception applies depends upon whether there was an adequate noninvestigatory justification for police actions. The same issue is raised here.

would later be subject to a warranted search. Parry's subjective motivation did not render the warrantless seizure illegal if the Jeep would have been towed for another reason unrelated to a criminal investigation. *Gaunce*, 114 Or App at 195. But the record includes no evidence to support such a finding. This case thus differs from *Penney*, where the trial court made an implicit finding, supported by evidence in the record, that the vehicle would have been towed regardless of police suspicions about criminal activity because the vehicle "presented a hazard in the roadway." 252 Or App at 686.

For the foregoing reasons, the state failed to carry its burden of showing that Parry's suspicions of criminal activity "play[ed] no part" in the decision to tow defendant's Jeep, as required for a lawful administrative seizure. *Gaunce*, 114 Or App at 195. Defendant's Jeep was, therefore, illegally seized.

The state's next argument, however, is that, even if the Jeep were seized illegally, the evidence that defendant sought to suppress was not obtained from that seizure; rather, it was obtained from the later *search* of the Jeep pursuant to the warrant. The state is correct that an illegal seizure does not necessarily require the suppression of evidence. *See State v. Hall*, 339 Or 7, 25, 115 P3d 908 (2005) ("[A]fter a defendant establishes the existence of a minimal factual nexus *** between the evidence sought to be suppressed and prior unlawful police conduct, the state nevertheless may establish that the disputed evidence is admissible under Article I, section 9, by proving that the evidence did not derive from the preceding illegality."). One way that the state may seek to have evidence admitted despite an illegal seizure is by demonstrating that "the police obtained the disputed evidence independently of the violation of the defendant's rights." *Id.*

The state analogizes this case to *State v. Smith*, 327 Or 366, 368-69, 963 P2d 642 (1998), where police, acting on information that the defendant had a marijuana grow operation, arrested the defendant and placed a padlock on a storage unit belonging to him, which they suspected contained evidence of the operation. Several hours later, having obtained a warrant, police searched the unit and found

incriminating evidence. *Id.* at 369. The issue on appeal was whether the defendant was entitled to the suppression of that evidence on the ground that police had unlawfully seized the storage unit when they padlocked it without first obtaining a warrant. The Supreme Court agreed that the seizure was illegal but nonetheless ruled against defendant. The court explained that under Oregon's exclusionary rule, suppression is required only if evidence "is *actually obtained* out of an illegal search or seizure[,]" and that "police may gain some degree of control over the contents of private property when they 'secure' that property, but they do not obtain *evidence* out of such a seizure." *Id.* at 379 (emphasis in original). The court further noted that,

> "in some circumstances, the act of securing certain property may permit the police to obtain evidence that otherwise would not be available to them. However, in the present case, it clearly did not. No one attempted to gain access to the unit to remove the evidence before the search warrant was executed. As such, the padlock, although unlawful, was irrelevant. The evidence would have been obtained even in the absence of the unlawful police conduct. The mere fact that evidence was discovered after that unlawful conduct does not require suppression."

*Id.* at 379-80 (footnote omitted).

Here, the state contends that even if the tow of defendant's Jeep was an illegal seizure, the evidence from the August burglary was nonetheless allowed under *Smith* because that evidence was "actually obtained" from the warranted search, not from the seizure. Defendant counters that the seizure of defendant's Jeep was causally connected to the discovery of the 4x4 decal match and the eventual discovery of the pH pen. In defendant's view, when police towed defendant's Jeep to the impound lot, that led directly to Lobaugh's inspection of the Jeep and, consequently, to Lobaugh's connection of the Jeep to the 4x4 decal found at the scene of the August break-in. Moreover, the decal match led directly to the issuance of the search warrant and the resulting discovery of the pH pen.[6]

---

[6] The state argues that defendant failed to preserve his argument that the illegal seizure of his vehicle requires the suppression of both the 4x4 decal match and the discovery of the pH pen. We disagree. Defendant's second motion

This case is distinguishable from *Smith*. In *Smith*, the Supreme Court reasoned that the unlawful padlocking of the storage unit merely secured whatever was inside it; that action itself did not contribute to the discovery of evidence. *Id.* at 379-80. Here, by contrast, the seizure of defendant's Jeep at least facilitated the discovery of evidence by making it possible for Officer Lobaugh to inspect the Jeep at the impound facility. In any event, because the trial court ruled that the seizure of the Jeep was *not unlawful,* the trial court had no reason to consider whether the pH pen and the evidence of the match of the 4x4 decal, like the evidence in *Smith*, "would have been obtained even in the absence of the unlawful police conduct." *Id.* at 380.

We decline to resolve that question because the record before us does not compel a conclusion either way. Although the seizure of the Jeep allowed Lobaugh to inspect the vehicle at the impound lot, it does not necessarily follow that the police could not have obtained the evidence another way. That is an issue that the trial court should resolve on remand, based on the existing record. *See State v. Johnson*, 335 Or 511, 526, 73 P3d 282 (2003) (holding that appellate courts must defer to a trial court's ruling regarding whether suppression is required unless "the evidence [is] of such a character or of such weight that the trial court was required" to rule only one way).

We have concluded that the trial court erred in ruling that the seizure of the Jeep was legal and, therefore, in denying defendant's motion to suppress on that basis (although, as just explained, it is possible that an alternative basis for denial exists, depending on the trial court's findings on remand). We also must consider whether the trial court's error prejudiced defendant. Evidentiary error is not presumed to be prejudicial. OEC 103(1). The question is

---

to suppress asked the trial court to suppress "all evidence discovered pursuant to the warrantless and unlawful 'seizure'" of his vehicle. That "evidence" encompassed the 4x4 decal match and the pH pen, which were discovered after police towed the vehicle and examined it for evidence connected to the August break-in. It is true that defendant did not expressly argue to the trial court that this evidence actually derived from the seizure, but it was not defendant's burden to do so. *See Hall*, 339 Or at 35 (it is the state's burden to prove that evidence was obtained "independent of, or only tenuously related to, the unlawful police conduct").

whether there is more than "little likelihood that the particular error affected the verdict." *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003). Defendant's challenge to the denial of his motion to suppress involves three counts (Count 2, Count 3, and Count 4). Counts 2 and 3 arise out of defendant's conduct during the August break-in. Because the 4x4 decal and the pH pen were the key pieces of evidence connecting defendant to that incident, we easily conclude that their admission into evidence was likely to affect the verdict.[7] Count 4, however, is the burglary charge arising out of the October incident, during which no items belonging to Carollo were taken. Nevertheless, defendant argues that the admission of the pH pen likely affected the verdict on that count because "[t]he jury could have found that the pH pen was evidence that defendant had entered a tent on the property before, in the August burglary, and thus found more credible the observations of the officer and the security personnel."

We do not agree that the pH pen was likely to influence the jury's deliberations on Count 4. At trial, the state offered testimony by the security manager for the PWB, who testified that security personnel observed defendant inside one of the tents during the October break-in. In addition, one of the responding police officers testified that defendant entered one of the tents shortly before being arrested. For his part, defendant testified that he simply could not remember whether he went into one of the tents.[8] In light of the ample evidence that defendant entered the tent in October

---

[7] As discussed above, the pH pen was taken during the August break-in and then later discovered in defendant's Jeep after the October break-in.

[8] At trial defendant testified as follows:

"[THE STATE:] Okay. And you never entered either tent.

"[DEFENDANT:] I don't remember entering any tent, because there was no back to this one, I know that. I may have went underneath the pipe there to get to there. I mean—

"[THE STATE:] Did you walk under the tarp?

"[DEFENDANT:] Absolutely I cannot answer that question. That could have been or could not have been. I just know that I was pretty much behind it when they apprehended me.

"[THE STATE:] Okay. So your testimony, then, is you don't know whether you entered that area or not.

"[DEFENDANT:] I entered that area to see what was going on and as far as—I don't know, I cannot remember if I was under that white tarp or not."

and defendant's own failure to refute that evidence at trial, we conclude that the pH pen was unlikely to have played a significant role in the jury's deliberations on Count 4.

B.  *Motion to Suppress: Search of Defendant's Vehicle*

We turn now to defendant's second assignment of error. In that assignment, defendant argues that the evidence discovered in his vehicle must be suppressed because Lobaugh's affidavit in support of the search warrant was insufficient to establish probable cause. Defendant contends that the facts described in the affidavit regarding the August 2011 break-in failed to support an inference that the Jeep was likely to still contain evidence in October 2011. We must address this assignment of error because, if we were to resolve it in defendant's favor, he could be entitled to suppression of the evidence regardless of how the issues surrounding the seizure of the Jeep are resolved. As explained below, however, we disagree with defendant.

"We review the sufficiency of a search warrant to determine whether, on the basis of the information in the affidavit, a neutral and detached magistrate could have concluded that there was probable cause to believe that the specified objects would be at the location sought to be searched." *State v. Clapper*, 216 Or App 413, 415, 173 P3d 1235 (2007); ORS 133.555(2). To meet that standard of proof, the state must be able to show that its allegations are more likely true than not true. *State v. Chambless*, 111 Or App 76, 80, 824 P2d 1183, *rev den*, 313 Or 210 (1992). "To determine probable cause, the judge may rely on facts asserted in the affidavit as well as reasonable inferences to be drawn from them." *State v. Daniels*, 234 Or App 533, 538, 228 P3d 695, *rev den*, 349 Or 171 (2010) (citing *State v. Anspach*, 298 Or 375, 381, 692 P2d 602 (1984)). Moreover, in light of the policy to "encourage searches pursuant to warrants," we "resolve marginal cases in favor of holding the warrant valid." *State v. Ingram*, 251 Or 324, 329, 445 P2d 503 (1968); *see also State v. Tacker*, 241 Or 597, 601-02, 407 P2d 851 (1965).

Here, defendant argues that certain facts alleged in the affidavit are too "stale" to support probable cause. The concept of staleness refers to "the analysis about whether

or not the evidence sought will be there after the length of time since the event described in the affidavit occurred." *State v. Young*, 108 Or App 196, 204, 816 P2d 612 (1991), *rev den*, 314 Or 392 (1992). The purpose of that analysis is "to determine whether, given the time between the event described and issuance of the warrant, there is a reasonable inference that the evidence will be where the affidavit suggests." *Id.* "Whether the passage of times makes a fact 'stale' depends on the character of the crime and the thing to be seized." *State v. Corpus-Ruiz*, 127 Or App 666, 670, 874 P2d 90 (1994). Moreover, "information that might otherwise be stale can be 'refreshed with more recent information that provide[s] a basis for concluding that criminal activity continued at the stated location.'" *State v. Chase*, 219 Or App 387, 393-94, 182 P3d 274 (2008) (quoting *State v. Castro*, 194 Or App 109, 118, 93 P3d 815 (2004)) (brackets in *Chase*).

Defendant's argument is based on the nature of the items taken during the August break-in and the passage of time between that incident and the search of the Jeep in October. Defendant points out that most of the items taken, with the exception of the two laptop computers, were specialized water-testing equipment. Defendant reasons that such items are more likely to be sold than to be held for personal use and that there was ample time to sell them between the August and October break-ins. Although defendant may be correct that a thief is more likely to try to sell specialized testing equipment than to keep it, that same logic also suggests that it might be more difficult to find a buyer for specialized equipment than for items that are more widely used by the general public. The issuing judge could reasonably have concluded, therefore, that the equipment, because it is not consumable or easily marketed, was more likely than not to still be in the vehicle. In addition, officers at the scene of the October break-in observed that the back seats of the Jeep were folded down and that "blankets were covering something in the rear of the vehicle." Given the totality of that information, we reject defendant's argument that the Lobaugh affidavit was stale as a matter of law. Accordingly, the trial court did not err in denying defendant's motion to suppress on that basis.

## C. *Motion for a Judgment of Acquittal*

In defendant's final assignments of error, he challenges the court's denial of his motion for a judgment of acquittal on the two burglary counts (Counts 2 and 4). Defendant argues that the state failed to establish the required element that defendant entered a "building" because the tents at the PWB property fall outside the definition of that term under ORS 164.215.

Whether a tent is a "building" for purposes of the burglary statute appears to be a matter of first impression. The legislature has defined "building" for the purposes of ORS 164.215 as either the "ordinary meaning" of that term or "any booth, vehicle, boat, aircraft or other structure adapted for overnight accommodation of persons or for carrying on business therein." ORS 164.205(1). The state concedes that the tents at the PWB property fall outside the "ordinary meaning" of the term "building." Instead, the state argues that the tents were buildings because they were "adapted" for use as Carollo's "places of business." As we explained in *State v. Nollen*, 196 Or App 141, 144, 100 P3d 788 (2004),

> "[t]he ordinary meaning of 'adapt' is 'to make suitable (for a new or different use or situation) by means of changes or modifications.' *Webster's Third New Int'l Dictionary* 23 (unabridged ed 1993). And the term 'business' ordinarily refers to 'a commercial or industrial enterprise' and to 'transactions, dealings, or intercourse of any nature.' *Id.* at 302."

In the state's view, the tents here were adapted for business use because "Carollo brought reactor equipment, control systems, workers, and tools into the tents and used them for extended periods of time as locations from which to conduct its testing operations." Defendant argues that that merely establishes that the tents were "used" for business, not that they were "adapted" for such use. According to defendant, the relevant inquiry is whether the tents were converted "from one, original purpose, to the purpose of carrying on the water-testing business."

Our cases instruct that the nature of the business being conducted is relevant to our inquiry. In *Nollen*, 196

Or App at 144, the alleged "building" was a trailer that was being used as a donation center. In that case, the adaptations to the trailer included "detaching the trailer from the tractor that towed it, * * * leaving the trailer at the transfer station for some period of time, * * * placing stairs next to it, and * * * placing permanent signs near the trailer advertising it as a donation collection station." Based on those factors, we concluded that the trailer was a building under ORS 164.205(1). *Id.* at 144-45. We reasoned that the owner had "'adapted' the trailer from its ordinary use as a transportation vehicle * * * for the purpose of carrying on [the] business of collecting donated goods and redistributing them to needy persons." *Id.* at 144.

More recently, in *State v. Webb*, 262 Or App 1, 6, 324 P3d 522 (2014), we reiterated that "[w]hether a vehicle or other structure has been adapted for carrying on a business will depend on the circumstances, including the nature of the business and the adaptations." In that case, the defendant argued that the tractor-trailer that he entered was not a "building" under the statute because "a vehicle or other structure is 'adapted for * * * carrying on business therein' if it is designed specifically for containing 'human beings for extended periods of time[.]'"[9] *Id.* at 4-5 (ellipses in original). The defendant argued that *Nollen* supported his position because the adaptations to the trailer in *Nollen* "included modifications that invited the public to its interior[,]" whereas the tractor-trailer that Webb entered had not been so modified. *Webb*, 262 Or App at 6. We rejected that argument, holding that it "place[d] undue emphasis on a single fact" and that "[t]he point" in *Nollen* was that "adaptations had been made to the trailer to transform it from a container used to transport items to a donation station." *Id.* In *Webb*, by contrast, the tractor-trailer was being "used for storage of inventory and business records," a purpose that did not require modifications to facilitate public access. *Id.*

_____

[9] Defendant's argument was based on the Commentary to the Criminal Law Review Commission Proposed Oregon Criminal Code Final Draft and Report § 135, 143 (July 1970), which explains that the definition of the term "building" as used in the burglary statute was drafted in accordance with "basic rationale of the crime: protection against invasion of premises likely to terrorize occupants." *Id.*; *see also, State v. Scott*, 38 Or App 465, 590 P2d 743 (1979) (relying on that commentary).

In this case, it is true that few, if any, physical modifications were made to the tents. That is not decisive, however. As we explained in *Nollen*, the ordinary meaning of "adapt" is "to make suitable (for a new or different use or situation) by means of changes or modifications." 196 Or App at 144 (citation and internal quotation marks omitted). One can effect "changes" to make a structure suitable for a new use without making physical modifications. Here, in order to make the tents suitable for use as a testing facility, Carollo employees brought in large equipment that was too heavy to easily move about the PWB property. They also set up a work bench. Smaller tools and equipment would typically be brought into the tents while employees were conducting tests. On those facts, we conclude that the tents were sufficiently adapted from any number of other possible uses for the specific purpose of allowing Carollo to carry on its water-testing business. As in *Webb*, the absence of physical modifications to the tents indicates only that such changes were not needed in order for Carollo's business to be conducted.

In short, because the tents could be considered "buildings" under the burglary statute, the court did not err in denying defendant's motion for a judgment of acquittal on the two burglary charges.

## III. CONCLUSION

For the foregoing reasons, we affirm the trial court's ruling denying defendant's motion for a judgment of acquittal on the two charges of second-degree burglary. The trial court erred, however, in ruling that the tow of defendant's Jeep was a lawful seizure and in denying defendant's motion to suppress on that basis. We also conclude, however, that the court did not determine whether the evidence that defendant sought to suppress would have been discovered even in the absence of the unlawful seizure. Accordingly, we vacate defendant's convictions on Counts 2 and 3, and remand with instructions to make that determination on the existing record.

Convictions on Counts 2 and 3 vacated and remanded for further proceedings; otherwise affirmed.