Argued and submitted January 30, affirmed April 1, petition for review denied August 27, 2020 (366 Or 827)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

CASEY CHARLES MISER,
*Defendant-Appellant.*

Marion County Circuit Court
17CR10440; A167323

463 P3d 599

In this criminal case, defendant appeals from a judgment of conviction resulting from his conditional guilty plea to multiple charges related to an illegal drug operation. On appeal, defendant argues, among other contentions, that the trial court erred in denying his motion to suppress evidence obtained during the execution of a warrant for his place of work because the affidavit failed to establish the required nexus between his work location and the evidence of drug crimes. *Held*: The totality of the circumstances presented in the affidavit, which included defendant's movements, phone activity, and behavior, established probable cause that physical evidence of drug activity would be found at defendant's place of work.

Affirmed.

Audrey J. Broyles, Judge.

Jason E. Thompson argued the cause for appellant. Also on the brief was Ferder Casebeer French Thompson & Stern, LLP.

Jeff J. Payne, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Powers, Presiding Judge, and Egan, Chief Judge, and Linder, Senior Judge.

POWERS, P. J.

Affirmed.

**POWERS, P. J.**

In this criminal case, defendant appeals from a judgment of conviction resulting from his conditional guilty plea to multiple charges related to an illegal drug operation. On appeal, defendant advances a number of challenges to the trial court's rulings on his motions to suppress evidence gathered during the execution of multiple search warrants. We reject all but one of those challenges without written discussion and write to address defendant's claim that the trial court erred in concluding that probable cause existed to search his place of work. As described below, we conclude that, although police observed defendant having only limited interactions with his place of work, those observations in combination with the pervasive nature of defendant's drug activities, lead to a reasonable conclusion that physical evidence of drug activity would be found at defendant's place of work. Accordingly, we affirm.

## I.   BACKGROUND

Law enforcement began investigating defendant after a lead from a different investigation related to the distribution of methamphetamine in the Salem area. Specifically, in January 2017, the Street Crimes Unit of the Salem Police Department began investigating Monica Flake for possible involvement in methamphetamine distribution. During the execution of a warrant authorizing the search of Flake's archived text messages, detectives found a series of messages believed to be from Flake's supplier, which was later determined to have been sent from a telephone number belonging to defendant. After learning about defendant's involvement, detectives obtained a search warrant and a court order authorizing the installation of a pen register/ trap and trace device on defendant's telephone number, as well as a mobile tracking device on defendant's red Ford truck. Using these devices, detectives tracked defendant's movements and phone activity.

As we discuss in more detail below, detectives discovered ample evidence showing that defendant was engaged in multiple drug transactions around Salem. That evidence included observations of defendant engaging in short meetings with people in parking lots consistent with drug deals

and evidence of numerous calls and text messages between defendant and known drug users consistent with illegal drug activity.

Detectives obtained a warrant to search, among other locations, defendant's place of work on Portland Road NE. In connection with defendant's work place, the affidavit prepared by Officer Garland supporting that warrant requested to "specifically search the areas limited to [defendant's] work station, vehicles and office space." The affidavit outlined the following instances involving defendant's place of work:[1]

Monday, January 30, 2017

- 3:12 p.m.:  Detective Emmons observed defendant driving a grey work van, branded with defendant's company logo, pull into the driveway of defendant's residence on Rafael Avenue. Emmons then observed defendant unload what appeared to be a roll of carpet from the van and carry it into the garage.

Wednesday, February 1, 2017

- 7:30 a.m.:  Defendant's work van was observed parked in the driveway of defendant's residence on Rafael Avenue.

- 5:29 p.m.:  The work van arrived and parked in the driveway of defendant's residence on Rafael Avenue.

- 5:34 p.m.:  The work van left the driveway of defendant's residence.

- 5:36 p.m.:  Officer Garland was off duty and shopping at AutoZone when he observed defendant's work van park in the parking lot of AutoZone. Inside the AutoZone, Garland encountered Flake and "exchanged a greeting with her." Garland then saw Flake leave in her car, and then saw defendant's work van leave the AutoZone parking lot. Text messages between defendant and Flake show that the two had plans to meet at AutoZone.

---

[1] Garland's affidavit provided the primary support for the warrant to search defendant's place of work; however, his affidavit also incorporated previous affidavits associated with the law enforcement investigation. Thus, our reference to "affidavit" incorporates all of the affidavits supporting the issuance of the challenged search warrant.

Friday, February 3, 2017

- 1:22 p.m.:   Emmons saw defendant leave his residence in his red truck and travel southbound on I-5, exiting at the Kuebler exit, and then traveling to the gas station adjacent to the Safeway grocery store. Defendant spent approximately one minute at the gas station before leaving and driving back to his work. The affidavit provides that Garland "believes, based upon his training and experience that it is extremely unlikely that the driver of [the] red Ford F250 was able to obtain fuel and pay for said fuel during the approximate one minute stop."

Saturday, February 11, 2017

- 11:20 a.m.:   Defendant was observed leaving his house.

- 11:42 a.m.:   Defendant arrived at his place of work and departed at about 12:19 p.m. After leaving his work, defendant was observed making several stops.

- 12:45 p.m.:   Defendant parked in the parking lot behind Healthy Harvest and loaded bags of what appeared to be potting soil into the bed of his truck. Defendant then drove to an address on Dorrance Loop NE and parked there for approximately one hour and 10 minutes.

- 2:31 p.m.:   Garland then followed defendant to Burger Basket and watched defendant and another individual enter Burger Basket.

- 3:19 p.m.:   Defendant exited Burger Basket alone and walked to his truck and appeared to retrieve something from inside his truck. Defendant then walked a few steps and entered the back-passenger seat of a maroon Ford Expedition. Defendant stayed in the back-passenger seat with the door closed for approximately four minutes. Defendant then exited the Ford Expedition, which then left the parking lot. Defendant did not walk directly back to the front door of the Burger Basket but walked towards the north side of the building and then circled back towards the front door. As defendant walked back towards Burger Basket, he appeared to put something in his right pocket. Garland noted that, "[b]ased on his demeanor and actions," defendant "was attempting to conceal himself from the windows of the business as he put something inside his front right pant pocket."

- 3:32 p.m.: Defendant left Burger Basket and was observed stopping at Garden Court NE for a brief moment and then leaving the area.

- 3:53 p.m.: Defendant arrived back home.

- 4:32 p.m.: Defendant and Flake exchanged text messages.

- 6:51 p.m.: Defendant left his home and drove to Michelangelo's restaurant and remained there for 15 minutes.

- 7:45 p.m.: Defendant arrived in the Fred Meyer parking lot. During that time Flake's phone registered as being in that general area, but detectives were unable to say definitively whether defendant and Flake met up.

- 7:55 p.m.: Defendant left the Fred Meyer parking lot. There were no further calls between defendant and Flake after 7:40 p.m.

## II.  LEGAL STANDARD

We review the trial court's determination that there was probable cause to issue a warrant for legal error. *State v. Castilleja*, 345 Or 255, 264, 192 P3d 1283, *adh'd to on recons*, 345 Or 473, 198 P3d 937 (2008). In so doing, we examine the facts in the supporting affidavit in a "commonsense, nontechnical and realistic fashion, looking at the facts recited and the reasonable inferences that can be drawn from those facts." *State v. Chase*, 219 Or App 387, 391-92, 182 P3d 274 (2008) (internal quotation marks omitted). Our task is "to determine, as a matter of law, whether [the affidavit] permits a conclusion by a neutral and detached magistrate that the items specified in the warrant will probably be found in a specified place to be searched." *Id.* at 392 (internal quotation marks omitted). Our standard of probability "requires more than a mere possibility, but less than a certainty" that the items will be found in one of the specified places. *State v. Wilson*, 178 Or App 163, 167, 35 P3d 1111 (2001) (internal citations omitted).

The facts of the affidavit and all reasonable inferences that can be drawn from those facts must establish a nexus among three things: "(1) that a crime has been, or is currently being, committed, and that (2) evidence of that

crime (3) will be found in the place to be searched." *State v. Van Osdol*, 290 Or App 902, 908, 417 P3d 488 (2018); *see also State v. Webber*, 281 Or App 342, 348, 383 P3d 951 (2016) (stating that "probable cause exists only if the affidavit sets forth facts that create a nexus between the place to be searched and the objects to be found"). In other words, it must be "more likely than not that the objects of the search will be found at the locations to be searched." *State v. Huff*, 253 Or App 480, 486, 291 P3d 751 (2012) (internal quotation marks and emphasis omitted). Finally, we look at "'the totality of the circumstances' presented in the affidavit," *State v. Klingler*, 284 Or App 534, 540, 393 P3d 737 (2017), and "we resolve doubtful or marginal cases in favor of the preference for warrants," *State v. Henderson*, 341 Or 219, 225, 142 P3d 58 (2006).

## III.   ANALYSIS

As noted earlier, although defendant raises a number of challenges to the warrant that authorized the search of, among other locations, his work place, we write to address only whether the affidavit established probable cause that the objects of the search would be located at defendant's place of work on Portland Road NE.[2] In that regard, defendant does not challenge the veracity of the facts asserted in the affidavit; rather, he asserts that the affidavit failed to establish the required nexus between his work location and the evidence of drug crimes. *See State v. Goodman*, 328 Or 318, 325, 975 P2d 458 (1999) (explaining that, because the "defendant did not move to controvert any of the statements in the affidavit and does not challenge them here," the court's review was "limited to whether the uncontroverted facts in the affidavit establish probable cause to search defendant's house"). For the following reasons, we conclude that the affidavit established probable cause to believe that defendant was involved in the distribution of methamphetamine and other drugs and that there was probable cause to believe that evidence of a drug operation would be located at defendant's place of work.

---

[2] In addition to "Attachment A" identifying the items to be seized, Garland's affidavit also specified a long list of items that could be found at defendant's work, including U.S. currency, any container that could contain U.S. currency, and evidence of controlled substances such as scales, plastic baggies, and written records and documents concerning methamphetamine possession and delivery.

We begin by describing some of the evidence establishing probable cause to believe that defendant was involved in the illegal distribution of drugs. That evidence included observations of defendant engaging in short meetings with people consistent with drug deals, evidence of a significant number of calls and text messages between defendant and known drug users consistent with illegal drug activity, and reasonable conclusions that can be drawn from the period that detectives monitored defendant's movement and activities.

On multiple occasions, detectives observed defendant stop at seemingly obscure locations and park there for short periods of time. For example, on February 4, Garland observed defendant drive his red Ford truck to an area near Willamette University and stop there for approximately one minute.[3] Defendant then drove to the Salem Public Library and stopped there for approximately 30 seconds. Detectives followed defendant from the library to Oregon Indoor Soccer, where defendant waited in the parking lot for approximately five minutes. No other vehicles were in the parking lot at the time and the business appeared to be closed. As defendant was leaving the Oregon Indoor Soccer parking lot, Emmons observed a man, later identified as Daniel, walking out of the parking lot. According to the pen register, around that time, defendant had a number of calls with a number associated with Daniel. Later that same day, detectives observed defendant stop in a parking lot south of Capitol Subaru for about three minutes. Detectives observed a man dressed similarly to the employees of Capitol Subaru leaning into the open passenger door of defendant's truck. Emmons, who was monitoring the pen register at that time, noticed a series of texts or calls between defendant's phone and a number associated with a known drug user who worked at Capitol Subaru.

Detectives also outlined in the affidavit that defendant, who had been convicted of unlawful delivery of marijuana in 2012 and other drug crimes in 2010, communicated

---

[3] From the pen register on defendant's telephone number, Emmons believed defendant's phone, and in turn, defendant, were "more likely than not" in defendant's truck.

by phone with people with histories of drug-related convictions. Emmons reviewed data from defendant's telephone and concluded that a significant number of the text messages and calls involved people with drug-related convictions. Emmons identified a number of the frequent callers and their drug-crime related histories, including the man who met briefly with defendant at Capitol Subaru, who had four drug-related arrests and a conviction for delivery of cocaine within 1,000 feet of a school. The frequent callers also included Flake, who had exchanged numerous text messages with defendant both before and during the observation period, who was identified as a source for methamphetamine from a cooperating defendant, and who had recently been arrested after a controlled methamphetamine buy in early January 2017.

With that background, we turn to the specific information in the affidavit that implicated defendant's place of work, a family-owned business where defendant's position allowed him access to a company van. During the observation period, detectives observed that defendant drove the company van on two separate days. As part of those observations, detectives twice observed defendant driving the work van to his residence, a location where there also was probable cause to search for evidence of drug crimes. Apart from detectives observing defendant's work van at his residence, Garland, who was off duty and shopping at AutoZone on February 1, saw defendant's work van in the parking lot. Inside the store, Garland ran into Flake and "exchanged a greeting with her." Before Garland saw her at AutoZone, Flake had exchanged text messages with defendant arranging to meet there. Shortly after Flake left, defendant's work van also left the parking lot. Although detectives did not see defendant and Flake interact, a reasonable inference from those facts is that defendant and Flake intended to meet at the AutoZone for a drug exchange.

In addition to observing defendant driving the company van, there were two days—February 4 and 11—where detectives observed defendant leave his place of work and then likely engage in drug activity. Specifically, defendant's movements on Saturday, February 11, outlined above, in which he stopped at his work for a short time and then later

engaged in behavior associated with drug dealing at Burger Basket, implicate defendant's place of work.

In sum, defendant's movements, phone activity, and behavior described in the affidavit established probable cause that defendant was running a drug operation that implicated his place of work. We reach that conclusion because the totality of the circumstances, which include defendant's history of and recent drug activity, his interactions with Flake, who also had engaged in extensive drug activity, combined with the detectives' observations drawn from defendant's movements and phone activity during the observation period, supported a reasonable inference that evidence of drug activity would be at defendant's place of work. *See State v. Villagran*, 294 Or 404, 413, 657 P2d 1223 (1983) (noting that "the circumstances of a case may give rise to probable cause to search several different locations at the same time, particularly where, as here, the evidence sought may be at once in more than one location"). Finally, even if there were any lingering doubt in this case, our standard of review dictates that "we resolve doubtful cases in favor of the preference for warrants." *State v. Chamu-Hernandez,* 229 Or App 334, 343, 212 P3d 514, *rev den*, 347 Or 43 (2009).

Affirmed.