*United States v. Harry*

# In the
# United States Court of Appeals
# for the Second Circuit

---

August Term 2024
Argued:  December 2, 2024
Decided: March 7, 2025

No. 23-7106

---

UNITED STATES OF AMERICA,
*Appellee*,

v.

KENSTON HARRY,
*Defendant-Appellant.*[*]

---

Appeal from the United States District Court for the District of Connecticut

---

Before:  LYNCH, LEE, AND PÉREZ, *Circuit Judges*.

On appeal from a judgment of the United States District Court for the District of Connecticut (Arterton, *J.*).

Defendant-Appellant Kenston Harry raises a question of first impression in this Circuit:  whether the government's warrantless use of a stationary pole camera situated outside an individual's business for approximately 50 days qualifies as a Fourth Amendment search.  Because we conclude that it does not, we hold that the district court was not required to exclude the pole-camera footage at Harry's criminal trial for drug trafficking.  Additionally, we determine that the district court properly concluded that Harry is not entitled to "safety-valve" relief under

---

[*] The Clerk of Court is respectfully directed to amend the official caption as set forth above.

18 U.S.C. § 3553(f), which provides that where specified criteria are met, a court is not required to impose any statutory minimum set forth in the Controlled Substances Act. We therefore affirm the judgment of the district court.

AFFIRMED.

---

CONOR M. REARDON (Patrick J. Doherty, Assistant United States Attorney, *on the brief*), of counsel, Assistant United States Attorney, New Haven, CT, *for* Vanessa Roberts Avery, United States Attorney for the District of Connecticut, *for Appellee.*

BRUCE S. HARVEY (Brandon A. Bullard, The Bullard Law Firm, Atlanta, GA, *on the brief*), Law Office of Bruce S. Harvey, Atlanta, GA, *for Defendant-Appellant*.

---

MYRNA PÉREZ, *Circuit Judge*:

This appeal chiefly concerns the admissibility of pole-camera evidence obtained without a warrant in a criminal proceeding, which raises a novel Fourth Amendment question in this Circuit. Defendant-Appellant Kenston Harry appeals a judgment of conviction for possessing controlled substances with intent to distribute and conspiracy to accomplish the same. We conclude that, in the circumstances present here, law enforcement's use of a stationary pole camera to monitor the exterior of Harry's business did not constitute a search requiring a warrant.

2

Harry also appeals his sentence. Applying our precedent, we determine that the district court did not err in finding that Harry had not met his burden of showing he is entitled under 18 U.S.C. § 3553(f) to "safety-valve" relief from his ten-year mandatory minimum. Accordingly, we affirm the judgment of the district court.

**BACKGROUND**

The events relevant to this appeal center, in the main, on the Action Audio Store ("Action Audio"), an automotive business in Hartford, Connecticut, that Harry owned and operated. The exterior of Action Audio and its adjoining parking lot are situated in a "triangle" bordered by two streets. Appellant's App'x 57–64; Gov't's App'x 585–87. On one side of the parking lot, there is a low fence with railings spaced far enough apart to view the parking lot clearly through them. *Id.* In addition, that fence bore, at the time of the captured pole-camera footage, colorful signs and advertisements. *Id.* These signs also did not visually obstruct the view of the premises.

Around March 2020, Drug Enforcement Administration ("DEA") agents began investigating Harry's co-defendant Tajh Wiley, who was the leader of the drug-trafficking scheme. Nearly a year later, agents tracked Wiley to Action

3

Audio, where they observed him receiving boxes from a cargo van before traveling to Harry's residence in Bloomfield, Connecticut ("Bloomfield residence"). Later that day, local law enforcement in Yonkers, New York, arrested Wiley after stopping his car and finding a kilogram of cocaine. From jail, Wiley called Harry and conveyed that the police "kn[e]w a lot" about their activities. Following Wiley's release from jail in Yonkers, federal investigators initiated a wiretap of Wiley's cell phone and captured incriminating conversations between him and Harry, among others.

In April 2021, as part of their investigation, DEA agents affixed a video surveillance camera to a utility pole on a lot across the street from Action Audio. The camera was connected to the internet and fed footage to DEA investigators, who could remotely tilt, pan, and zoom the camera. The camera recorded 24 hours per day for approximately 50 days. Its feed captured Action Audio's exterior, the outdoor parking lot, and, occasionally, a slice of the interior of the business's garage bay whenever the garage door was raised.[1]

---

[1] For an overlapping period, the government also obtained warrants to collect real-time and historical cellular site location information ("CSLI") from Harry's cell phone. The CSLI collected is not at issue in this appeal.

In June 2021, Harry was arrested. Investigators searched Action Audio, the Bloomfield residence, his vehicles, and his cell phone.[2] They found narcotics and firearms in both Action Audio and the Bloomfield residence.[3] Specifically, at Action Audio, agents uncovered more than 1.5 kilograms of marijuana, along with a digital scale and powder residue. They also seized three loaded firearms near the marijuana, in addition to a semi-automatic assault rifle with two loaded, large-capacity magazines, a shotgun and corresponding boxes of ammunition, a revolver, and other scattered ammunition. None of the firearms at Action Audio were registered to Harry, and the assault rifle and related magazines were illegally possessed in the state of Connecticut. At the Bloomfield residence, which Harry shared with his brothers and cousin, agents found kilogram quantities of fentanyl, cocaine, and marijuana. Near the narcotics, investigators also recovered a pistol not registered to Harry, along with assorted ammunition.

## I.    Procedural History

The district court denied Harry's motion to suppress the pole-camera evidence. The government introduced 28 minutes' worth of footage at trial, which

---

[2] Defendant does not challenge the constitutionality of these searches.

[3] Harry was arrested in his Bentley, where investigators found a pistol for which he possessed a valid permit and loaded ammunition magazines.

showed Wiley, Harry, and another co-defendant transferring bags of what the government adduced to be controlled substances to their vehicles. A jury convicted Harry of possession with intent to distribute fentanyl, cocaine, and marijuana, respectively; and of conspiracy to accomplish the same.[4]

The district court sentenced Harry principally to ten years (120 months) on the fentanyl- and cocaine-related charges, including conspiracy—the mandatory minimum under the Controlled Substances Act, 21 U.S.C. § 841(a)(1), (b)(1); *id*. § 846. For the possession of marijuana count, it sentenced Harry to five years (60 months), to run concurrently. In so doing, it denied Harry safety-valve relief from his ten-year sentence. 18 U.S.C. § 3553(f) and the Sentencing Guidelines § 5C1.2 provide for such relief; where certain criteria are met, the court is relieved of the obligation to impose the otherwise applicable mandatory minimum. The district court thereafter denied Harry's motion to reconsider his eligibility for safety-valve relief.

Harry timely appealed, raising (1) the admissibility of the pole-camera footage at his trial; and (2) the applicability of the safety-valve provision to his sentence.

---

[4] Harry had conceded guilt as to the marijuana count and as to the conspiracy charge insofar as marijuana was concerned.

**STANDARD OF REVIEW**

As to Harry's claim involving the admission of pole-camera evidence, "this Court reviews the district court's factual findings" in connection with its denial of a suppression motion "for clear error, and its application of law to fact *de novo*." *United States v. Lewis*, 62 F.4th 733, 740 (2d Cir. 2023). Provided there is error in admitting evidence obtained in violation of the Fourth Amendment, we evaluate that error for harmlessness. *United States v. Dhinsa*, 243 F.3d 635, 660 (2d Cir. 2001).

As to Harry's claim to safety-valve relief, we review the district court's underlying factual findings for clear error. *United States v. Ortiz*, 136 F.3d 882, 883 (2d Cir. 1997). The district court commits clear error only if we are left "with the definite and firm conviction that a mistake has been committed." *United States v. Osuba*, 67 F.4th 56, 65 (2d Cir. 2023) (citation omitted), *cert. denied*, 144 S. Ct. 577 (2024).

**DISCUSSION**

We consider for the first time in this Circuit whether the warrantless use of a stationary pole camera located outside of a defendant's business for approximately 50 days violates the Fourth Amendment—and therefore whether

7

the evidence obtained from that endeavor must be excluded at a criminal trial.[5]

Additionally, we examine whether 18 U.S.C. § 3553(f) entitles Harry to relief from the statutory mandatory minimum for certain of his narcotics convictions.  After careful inquiry, we answer both questions in the negative.

## I.  The Pole-Camera Usage Did Not Constitute an Unreasonable Search

### A. The Fourth Amendment and the Exclusionary Rule

The Fourth Amendment protects against "unreasonable searches and seizures."  U.S. Const. amend. IV; *see id.* ("[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.").  Warrantless searches are ordinarily "*per se* unreasonable under the Fourth Amendment— subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009).  In accordance with the Fourth Amendment's protections, "[c]ourts have . . . developed the 'exclusionary rule'— which requires trial courts to exclude unlawfully seized evidence from criminal trials—as the 'principal judicial remedy to deter Fourth Amendment violations.'"

---

[5] We recently considered law-enforcement usage of cameras in a different Fourth Amendment context, in a case that concerned the use of an iPhone camera to view the interior of a defendant's car through tinted windows.  *See United States v. Poller*, --- F.4th ---, No. 24-75-cr, 2025 WL 555563 (2d Cir. Feb. 20, 2025).  Our analysis is fully consistent with the analysis in *Poller*.

*United States v. McKenzie*, 13 F.4th 223, 231 n.5 (2d Cir. 2021) (quoting *Utah v. Strieff*, 579 U.S. 232, 237 (2016)).

But not all law enforcement-initiated surveillance qualifies as a "search." Rather, a Fourth Amendment search occurs only if the target had a "'reasonable expectation of privacy' in the area searched." *Lewis*, 62 F.4th at 741 (quoting *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring)); *accord Carpenter v. United States*, 585 U.S. 296, 310 (2018). That standard, in turn, is defined by a two-part, conjunctive test: "first, has the individual manifested a subjective expectation of privacy in the object of the challenged search? Second, is society willing to recognize that expectation as reasonable?" *McKenzie,* 13 F.4th at 232 (citation omitted). Put differently, to benefit from the exclusionary rule, Harry had to show that he maintained both a subjective and an objectively reasonable expectation of privacy in Action Audio's exterior and parking lot. *See Lewis*, 62 F.4th at 741 (explaining that "the proponent of the motion to suppress" carries the "burden to establish that the search violated his Fourth Amendment rights").

Though many of our sister circuits have considered the issue of law enforcement's use of pole cameras in light of the Fourth Amendment, this question is one of first impression in our Circuit. Nearly every circuit to have passed on the

9

question has held that pole cameras do not constitute a search within the meaning of the Fourth Amendment. *See United States v. Vankesteren*, 553 F.3d 286, 291 (4th Cir. 2009); *United States v. Dennis*, 41 F.4th 732, 740–41 (5th Cir. 2022), *cert. denied*, 143 S. Ct. 2616 (2023); *United States v. May-Shaw*, 955 F.3d 563, 567–69 (6th Cir. 2020); *United States v. Tuggle*, 4 F.4th 505, 510–11 (7th Cir. 2021); *United States v. Hay*, 95 F.4th 1304, 1313–18 (10th Cir. 2024), *cert. denied*, No. 24-72, 2024 WL 4874676 (U.S. Nov. 25, 2024). The First Circuit, sitting en banc, affirmed the use of a pole camera in a criminal case, with the panel evenly split on whether there was no search at all or whether there was one that the Fourth Amendment's good-faith exception excused. *Compare United States v. Moore-Bush*, 36 F.4th 320, 328 (1st Cir. 2022) (Barron, J., concurring) (concluding "that the good-faith exception to the warrant requirement" applied), *cert. denied sub nom. Moore v. United States*, 143 S. Ct. 2494 (2023), *with id*. at 363 (Lynch, J., concurring) (finding neither a subjective, nor an objectively reasonable expectation of privacy).

We now hold that the use of a stationary pole camera, at least as deployed here—to monitor the publicly visible exterior of a target's business for a period of 50 days—does not constitute a search under the Fourth Amendment. We so

10

conclude after examining, in turn, Harry's subjective and objective expectations of privacy in this context.

## B. Harry's Subjective Expectation of Privacy

We first ask whether Harry has "manifested a subjective expectation of privacy" in the exterior of Action Audio and its parking lot. *See California v. Ciraolo*, 476 U.S. 207, 211 (1986). We have previously held that "what a person knowingly exposes to the public . . . does not receive Fourth Amendment protection, yet what a person tries to keep private . . . may be entitled to constitutional protection." *United States v. Davis*, 326 F.3d 361, 365 (2d Cir. 2003).

Harry made little to no effort to conceal the goings-on outside of Action Audio. Here, only a very low fence borders one side of the Action Audio parking lot. Through it, the parking lot and the exterior of Action Audio—and the activities therein—remained clearly visible. *See* Appellant's App'x 57–64; Gov't's App'x 587. This is not the "10-foot fence" that the *Ciraolo* Court concluded clearly demonstrated the defendant's subjective expectation that passersby on foot would be unable to see what was hidden behind. *See Ciraolo*, 476 U.S. at 211. Additionally, when the business's garage door was open, some of the garage's interior could be glimpsed from the street. Gov't's App'x 587–88. "[W]hat a person knowingly exposes to the public through an open door or window does

11

not receive Fourth Amendment protection." *Davis*, 326 F.3d at 365. Moreover, it would be incongruous for a proprietor of a business to claim a subjective privacy interest in the publicly visible aspects of his business's premises during work hours. Harry has thus manifested no "subjective expectation of privacy in the object of the challenged search." *See McKenzie,* 13 F.4th at 232.

### C. The Objective Reasonableness of Any Purported Expectation of Privacy

We next consider whether an expectation of privacy in the comings and goings outside of Harry's business is one that "society [is] willing to recognize . . . as reasonable." *Id*. We turn first to instructive precedent.

We have articulated an "open fields doctrine," under which individuals "generally do not have a legitimate expectation of privacy in open and accessible areas that the public is prepared to recognize as reasonable." *See United States v. Lace*, 669 F.2d 46, 50 (2d Cir. 1982) (internal quotation marks omitted); *accord Katz*, 389 U.S. at 351 ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."); *McKenzie*, 13 F.4th at 232 ("[O]bservations of items in plain view (or plain hearing, smell, or feel), and recoveries of abandoned property are not protected by the Fourth Amendment under this test."). So, for example, an individual enjoys no

objectively reasonable expectation of privacy in outdoor premises open to the public, when a government inspector enters to examine smoke coming from the owner's chimney. *See Air Pollution Variance Bd. v. W. Alfalfa Corp.*, 416 U.S. 861, 862–65 (1974), Neither is one's expectation of privacy objectively reasonable on a property outsiders could enter at will or observe from the public highway, *see Lace*, 669 F.2d at 49–51; in an area that the government can observe by plane, *see Dow Chem. Co. v. United States*, 476 U.S. 227, 235, 239 (1986); or for a property visible over a fence to individuals perched atop "a [hypothetical] truck or a two-level bus," *see Ciraolo*, 476 U.S. at 211.

So, too, here. Action Audio's parking lot and storefront were open—and more importantly, visible—to the public. "Generally, the police are free to observe whatever may be seen from a place where they are entitled to be." *United States v. Fields*, 113 F.3d 313, 321 (2d Cir. 1997). Neither is there any basis for us to treat the occasionally open garage differently. "[T]he mere fact that an individual has taken measures to restrict some views of his activities [does not] preclude an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible." *Ciraolo*, 476 U.S. at 213.

13

And Harry is on especially infirm footing here, because the surveilled area was his business, rather than his home. Privacy expectations are "most heightened" in one's home. *See Florida v. Jardines*, 569 U.S. 1, 7 (2013) (quoting *Ciraolo*, 476 U.S. at 213). There may well be scenarios in which a person maintains an objectively reasonable expectation of privacy in aspects of her business, but here, given that the pole camera monitored only what was publicly visible, Harry cannot clear this additional hurdle. *See New York v. Burger*, 482 U.S. 691, 700 (1987) ("An expectation of privacy in commercial premises, however, is different from, and indeed less than, a similar expectation in an individual's home."); *Dow Chem. Co.*, 476 U.S. at 237 (noting that "the Government has 'greater latitude to conduct warrantless inspections of commercial property'" (quoting *Donovan v. Dewey*, 452 U.S. 594, 598 (1981))).

Finally, a trio of Supreme Court cases to which Harry points does not contradict our conclusion. Harry tells us that these cases show that there is something about the breadth and depth of the government's activities here that converts the pole-camera usage into a search. Specifically, he takes issue with the camera's "sleepless, unblinking" recording over 50 days, which he argues is

14

materially different from a DEA agent's physical surveillance. Appellant's Br. 30. We are unpersuaded.

When modern technology enhances law enforcement's traditional surveillance capabilities, the Supreme Court has recognized a Fourth Amendment search only when law enforcement uses particularly invasive forms of technological surveillance—involving, for example, technology that is either not widely accessible or particularly all-encompassing. First, in *Kyllo v. United States*, the Supreme Court held that the use of a "thermal-imaging device aimed at a private home from a public street to detect relative amounts of heat within the home" qualifies as a search requiring a warrant. 533 U.S. 27, 29, 40 (2001). It reasoned that "the Government use[d] a device that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion." *Id*. at 40. Second, in *United States v. Jones*, the Court concluded that the government undertakes an unreasonable search when it attaches a GPS tracking device to a person's vehicle without first obtaining a warrant. 565 U.S. 400, 404–05 (2012). There, in determining that a search had occurred, the Court relied on the law of trespass—explaining that the government "physically occupied private property for the purpose of obtaining information." *Id*.; *see also*

15

*id*. at 417 n.* (Sotomayor, J., concurring) (noting that the GPS device was not "stationary" and that "[a] car's movements . . . are its owner's movements").[6]  By contrast, the pole camera used here constitutes neither a form of inaccessible technology capturing details unknowable without physical intrusion, nor a physically trespassory attachment to an object that moves along with the target. Additionally, the camera's tilting, panning, and zooming functionalities, and its connection to the internet, are rudimentary in comparison to the thermal-imaging technology employed in *Kyllo*.

Third, the Supreme Court held in *Carpenter* that retrospective cell-site location information ("CSLI") collected for a period of seven days from a target's phone constitutes a search.  *Carpenter*, 585 U.S. at 296, 300, 310 n.3.  CSLI allows the government to locate a surveilled individual's movements with great precision, because phones ordinarily tap into the wireless network of local cell sites "several times a minute." *Id*. at 300.  The *Carpenter* Court therefore expressed unique concern that CSLI "provides an all-encompassing record of the [cell phone] holder's whereabouts" and "an intimate window into a person's life."  *Id.* at 311.

---

[6] We note that the Court warned that it "do[es] not make trespass the exclusive test"—rather, "[s]ituations involving merely the transmission of electronic signals without trespass would remain subject" to the reasonable-expectation-of-privacy test. *Jones*, 565 U.S. at 411 (emphasis omitted).

A cell phone is "almost a 'feature of human anatomy'" and "tracks nearly exactly the movements of its owner." *Id*. (quoting *Riley v. California*, 573 U.S. 373, 385 (2014)); *see also id*. at 312 (observing that CSLI data provides "near perfect surveillance" of a "retrospective" nature).

But the Court also expressly cautioned that its ruling in *Carpenter* was "a narrow one." *Id*. at 316. Notably, it "d[id] not . . . call into question conventional surveillance techniques and tools, *such as security cameras*." *Id*. (emphasis added). Devices such as the pole camera at issue here are thus expressly excluded from *Carpenter*'s holding. Additionally, the stationary pole camera trained only on Action Audio's exterior does not meaningfully resemble an all-encompassing "feature of human anatomy" like one's cell phone.

We conclude that here, the DEA's warrantless collection of footage of activities in public view at Harry's business, for a period of 50 days, using a stationary pole camera, did not violate the Fourth Amendment. Accordingly, the district court did not err in admitting video from the camera's feed at Harry's trial.

## II. Harry Was Not Eligible for Safety-Valve Relief from the Mandatory Minimum Imposed

Under 18 U.S.C. § 3553(f), a court will not apply the mandatory minimum to a defendant convicted, like Harry, of fentanyl- or cocaine-related charges under

17

the Controlled Substances Act where five criteria are met. This safety-valve provision, if applicable, would have relieved Harry of his statutorily mandated ten-year sentence.

Before us, Harry contests only the district court's determination as to one of the provision's five criteria—whether he "possess[ed] a firearm or other dangerous weapon . . . in connection with the offense" of which he was convicted. 18 U.S.C. § 3553(f)(2). Under that provision, Harry bore the burden of proving at sentencing by a preponderance of the evidence that he did not possess the firearms found at Action Audio, the Bloomfield residence, and on his person "in connection" with the drug-trafficking scheme. *See id*.; *see also United States v. Jimenez*, 451 F.3d 97, 102 (2d Cir. 2006); *United States v. Gambino*, 106 F.3d 1105, 1110 (2d Cir. 1997).

The statute's language requiring that the firearms have been used "in connection" with the crime, 18 U.S.C. § 3553(f)(2), has been interpreted as "equivalent to the 'in relation to' language of 18 U.S.C. § 924(c)(1)." *See United States v. DeJesus*, 219 F.3d 117, 122 (2d Cir. 2000). Section 924(c)(1), in turn, is a sentencing enhancement that applies if the defendant uses or carries a firearm in relation to or in furtherance of a specified crime. *See* 18 U.S.C. § 924(c)(1).

In our parallel § 924(c)(1) cases, we have explained that to find the requisite nexus between the firearm and the crime, the weapon "at least must facilitate, or have the potential of facilitating," the crime. *DeJesus*, 219 F.3d at 122 (quoting *Smith v. United States*, 508 U.S. 223, 238 (1993)). Thus, "the ultimate question is whether the firearm afforded some advantage (actual or potential, real or contingent) relevant to the vicissitudes of drug trafficking." *United States v. Snow*, 462 F.3d 55, 62 (2d Cir. 2006) (internal quotation marks and citation omitted). A court "can consider relevant factors like the type of drug activity that is being conducted, accessibility of the firearm, the type of the weapon, whether the gun is loaded, proximity to drugs or drug profits, and the time and circumstances under which the gun is found." *Lewis*, 62 F.4th at 746 (internal quotation marks omitted and alterations adopted).

Applying this standard here, we hold that the district court did not clearly err in concluding that Harry failed to carry his burden of demonstrating his possession of myriad firearms lacked a connection to his drug-trafficking activities. *See Ortiz*, 136 F.3d at 883 (setting forth the clear-error standard of review for the district court's factual findings at sentencing). The firearms at Action Audio, the Bloomfield residence, and on Harry's person were readily accessible

19

and stored near large quantities of narcotics. Harry admitted to personally carrying a pistol at nearly all times. In addition, the district court credited evidence of a loaded pistol and ammunition found in Harry's bedroom at the Bloomfield residence, near a Burberry box of fentanyl and cocaine. Nearby were also buckets of cocaine and three kilograms of marijuana. *Id*. At Action Audio, the site that served "as the hub to distribute drugs," Harry kept additional guns and ammunition, including an assault rifle and large-capacity magazines banned in the state of Connecticut, again near large quantities of marijuana. Appellant's App'x 1372–73 (Sent'g Tr. 69–70). Thus, in two places "central" to Harry's participation in a large-scale narcotics trafficking operation, *id*. at 1374 (Sent'g Tr. 71), Harry stored numerous firearms in close "proximity to drugs or drug profits," *see Lewis*, 62 F.4th at 746. These are the same factors that we concluded in *Lewis* and *Snow* were sufficient to support conviction under 18 U.S.C. §924(c) beyond a reasonable doubt. *Lewis*, 62 F.4th at 745–46; *Snow*, 462 F.3d at 62–63. If facts such as these are sufficient to support a jury's finding that a gun was used in furtherance of a drug crime beyond a reasonable doubt, they are also sufficient to justify the district court's finding that Harry did not prove the opposite by a preponderance of the evidence.

Consequently, we are satisfied that the district court did not clearly err in its factual findings supporting its determination that Harry was not eligible for safety-valve relief. We affirm the sentence the court imposed.

## CONCLUSION

The government's use of a stationary pole camera for 50 days to capture scenes from the exterior of the Defendant's business that were readily visible to the public did not constitute a Fourth Amendment search. The district court was thus not required to exclude the pole-camera evidence at Harry's criminal trial. Furthermore, Harry did not meet his burden of showing that he is entitled to safety-valve relief from his mandatory-minimum sentence under the Controlled Substances Act.

We therefore **AFFIRM** the judgment of the district court.

21