No. 111 February 19, 2026 229

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

DAVID FRANK LANE,
*Defendant-Appellant.*

Marion County Circuit Court
20CR47352; A183592

Daniel J. Wren, Judge.

Argued and submitted January 7, 2026.

Sara De La Cruz, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Oregon Public Defense Commission.

Joanna Hershey, Assistant Attorney General, argued the cause for respondent. Also on the brief were Dan Rayfield, Attorney General, and Benjamin Gutman, Solicitor General.

Before Ortega, Presiding Judge, Joyce, Judge, and Hellman, Judge.

JOYCE, J.

Affirmed.

**JOYCE, J.**

Defendant entered a conditional plea to one count of felon in possession of a firearm, reserving his right to challenge the trial court's rulings on two motions to suppress. Defendant's first motion to suppress sought to exclude evidence that officers obtained by using a camera attached to a telephone pole (pole camera) because the use of the camera constituted a "search" and officers did not have a warrant. The second motion to suppress sought to exclude evidence that officers obtained through a search warrant, which defendant contended was based on stale information and was insufficiently particular. As to the pole camera, we conclude that the officers did not conduct a search under either the Oregon or United States constitutions because it captured information that would otherwise be available to the public and was not pervasive in terms of the scope of information that it recorded. As to the second motion to suppress, the trial court correctly concluded that the information upon which officers relied was not stale and that the warrant itself was sufficiently particular. We therefore affirm.

## I.   MOTION TO SUPPRESS
## POLE CAMERA EVIDENCE

A.   *Factual Background*

We describe the facts relevant to defendant's motion to suppress the evidence derived from the pole camera. We review the trial court's ruling for legal error and are bound by the trial court's factual findings if there is evidence in the record to support them. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993).

Police installed a pole camera outside of a house on Baldwin Street in Salem after learning that items stolen during a burglary of a marijuana dispensary had been taken to the house. Police believed that defendant had been involved in the burglary and wanted to see if he lived at or frequented that home.[1] Police installed a camera on a telephone

---

[1] The police installed two cameras, but because the state did not rely on any footage from the second camera, the trial court did not consider any footage from that camera. We therefore describe only the location of and evidence that came from the camera from which officers obtained the evidence that defendant sought to exclude.

pole that allowed the police to "remotely manipulate" the camera's position and zoom in and out. The camera's vantage point allowed police to see a part of the house's exterior, the driveway, and the walkway to and from the front door. They could not see inside the home or the backyard.

The police used the pole camera to surveil defendant for approximately four weeks. Officers saw defendant coming and going from the house 15 times, and 10 of those observations were from the pole camera's footage.

Police then obtained a search warrant for the house (the details of which we will address in response to defendant's second assignment of error). After executing the warrant, officers found drugs and weapons.

Defendant moved to suppress the evidence from the pole camera, as well as its derivative fruit.[2] He argued that use of the pole camera constituted a "search" within the meaning of Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution and, because officers did not have a warrant to use the pole camera, that the search was unconstitutional.

The trial court denied the motion. The court found that the view from the pole camera did not show the front door; it captured the driveway and part of a walkway, both of which were "fair game for people on the streets to see[.]" If "a police officer sat in that same area for 30 days 24/7, we would not be concerned," and the fact that officers used technology to capture what they otherwise would be able to see themselves did not create a "search" as that term is used in either the state or federal constitutions. The trial court distinguished cases in which both the Oregon Supreme Court and the United States Supreme Court have found that the use of technology was a "search" by noting that those cases—both of which involved the placement of location trackers on a person's car—were "more intrusive when

_____

[2] In the motion to suppress, defendant expressly disclaimed that the home that was surveilled was his personal residence and stated that his home was located elsewhere in Salem. Officers confirmed through a records check that defendant's address was not the surveilled house. As explained below, those facts are significant in light of the protections of Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution.

we're talking about comings and goings" and allowed officers to track "each and every location that that car goes," whereas the pole camera was "a stationary object that just record[ed] comings and goings of a particular location[.]" *See State v. Campbell*, 306 Or 157, 759 P2d 1040 (1988) (use of a radio transmitter attached to a car to track its location was a search under Article I, section 9); *United States v. Jones*, 565 US 400, 132 S Ct 945, 181 L Ed 911 (2012) (attachment of a GPS device to a car to track the car's movements was a search under the Fourth Amendment). The court therefore concluded that the evidence obtained from the pole camera was not a search under Article I, section 9, or the Fourth Amendment and denied defendant's motion to suppress.

Defendant appeals, reprising his argument that police conducted a search as that term is understood under both the state and federal constitutions. Following our typical methodology, we begin with Article I, section 9. *Sterling v. Cupp*, 290 Or 611, 614, 625 P2d 123 (1981) (articulating the "first things first" doctrine). Because we conclude that use of the pole camera was not a search under that provision, we then consider that same question, but under the Fourth Amendment. We reach the same conclusion under that provision and therefore affirm the trial court's denial of defendant's motion to suppress.

B.   *Article I, section 9, of the Oregon Constitution*

Article I, section 9, protects the right of people "to be secure in their persons, houses, papers, and effects, against unreasonable search[.]" The parties agree that the single issue that we must decide is whether the pole camera surveillance constituted a search.

We begin with some basic, undisputed principles. A search occurs under Article I, section 9, when the government "invades a protected privacy interest." *State v. Brown*, 348 Or 293, 297, 232 P3d 962 (2010). But a police officer is not engaged in a search when they make unaided observations from a lawful vantage point or from a public place. *See State v. Ainsworth*, 310 Or 613, 621, 801 P2d 749 (1990) ("[A] police officer's unaided observation, purposive or not, from a lawful vantage point is not a search under Article I,

section 9, of the Oregon Constitution."); *Campbell*, 306 Or at 170 ("A court has never held * * * that a police officer engages in a search by making unaided observations from a public place, and an individual therefore cannot be said to have a constitutionally protected interest in freedom from such scrutiny.").

As particularly relevant here, use of specialized technology to enhance an officer's view of otherwise public areas also does not constitute a search. *State v. Wacker*, 317 Or 419, 427, 856 P2d 1029 (1993) (no search occurred when officers used technology to observe the defendant's drug transactions in a lit car in a tavern parking lot—even though that technology allowed the officers to see better in the dark and to magnify images—when the defendant was engaged in activities that were readily observable to the public); *see also State v. Smith*, 327 Or 366, 371, 963 P2d 642 (1998) (the Supreme Court has "never suggested that [the] use of *any* device or enhancement—no matter where that device or enhancement was used—would qualify" as a "constitutionally significant 'search'" (internal citation omitted; emphasis in the original)); *State v. Louis*, 296 Or 57, 61, 672 P2d 708 (1983) (no search where police used a telephoto lens, which allowed for "modest enlargement," to photograph activities inside of home from other side of street, where activities could be seen from the street without a telephoto lens). Rather, with respect to whether the use of technology constitutes a search, the "controlling questions" are "whether police were able to obtain information that was materially different from information the defendant made available to others and whether the police conduct swept so broadly that it amounted to pervasive surveillance of the defendant's daily life." *State v. Combest*, 271 Or App 38, 56, 350 P3d 222, *rev den*, 358 Or 70 (2015).

By way of example, use of a radio transmitter device that allowed officers to track the defendant's movements in a manner that they otherwise would be unable to track visually constitutes a search; that is because the device allowed officers to collect information that is materially different than what they otherwise would have been able to gather. *Campbell*, 306 Or at 171-72. Rather than being "a device for

'enhancing' visual observations in the manner of moderate power binoculars or camera lenses[,]" the radio transmitter device provided information to police that is starkly different, and more intrusive, from the information that they could lawfully obtain from visually tracking a car's movements. *Id.* at 166, 171-72 ("[U]se of a radio transmitter to locate an object to which the transmitter is attached cannot be equated with visual tracking."); *see also Combest*, 271 Or App at 51 (describing use of the transmitter in *Campbell* as being "only nominally public; the transmitter gave the officers access to information that was materially different than the information the defendant broadcast to those who could see him traveling in his car"). The device allowed officers "[d]ay and night, over a period of several days [to] track [and capture a] defendant's movements within a 40-mile radius, whether [their] vehicle [is] on a busy city street or a secluded highway." *Combest*, 271 Or App at 51 (describing *Campbell*); *see also State v. Meredith*, 337 Or 299, 306-07, 96 P3d 342 (2004) (distinguishing *Campbell* because "[t]he officers [in *Campbell*] subjected the defendant and his vehicle to pervasive and constant examination of his movements and location throughout his daily life"). That degree of intrusion and ability to capture information that was not otherwise available to officers through mere observation thus constituted a search. *See also State v. Hawthorne*, 316 Or App 487, 497, 504 P3d 1185 (2021), *rev den*, 369 Or 856 (2022) (the collection of real-time cell phone location data is a search because "[t]he power to track location has the potential to reveal where a person spends time—information that could reflect a person's religious, political, social, or professional associations" and "[a]s ubiquitous as cell phones are, they could become tracking devices that the authorities could tap into at will").

        With those legal principles so framed, we turn to the pole camera at issue here. We agree with the trial court that the pole camera neither captured information that was materially different from the information that defendant made available to others, nor did its use in this case amount to pervasive surveillance. It is undisputed that the pole camera was mounted on public property and captured only

10 instances of defendant coming and going from the house; activity that was visible to any member of the public.[3]

For his part, defendant acknowledges that the camera captured the same kind of information that a member of the public or a neighbor's home camera could capture but maintains that use of the camera is still a search because it "allowed the police to record defendant's movements for later review and use and the cameras could be remotely zoomed and manipulated." But again, technology that allows police to enhance or more easily view what otherwise is readily viewable to the public does not constitute a search. *Wacker*, 317 Or at 427 (when officers used technology to observe the defendant's drug transactions in a lit car in a tavern parking lot—even though that technology allowed the officers to see better in the dark and to magnify images—the officers were not engaged in a search). For instance, in *Combest*, police used a software program that searched a peer-to-peer network for files likely to contain certain material, narrow the results to users in a particular geographic region, and download and log that information for particular users. 271 Or App at 43. The technology made it easier for police to locate and organize information that was relevant to the investigation—by using the software, police did not have to "'search thousands and thousands' of files to find one with an IP address in their jurisdiction." *Id.* at 42-43. We rejected the notion that use of the software allowed officers to obtain or organize information that was materially different than that available to the public: "[T]he information *** was the same information that was available to any other user of the network" and the technology that officers used to organize that information simply "created efficiencies or conveniences in police practice." *Id.* at 55-56. Similarly here, as the trial court found, the use of the camera that recorded and zoomed in and out captured the same kind of visual information that was available to any other member of the public with the naked eye. *Cf. State v. Nakhiengchahn*, 341 Or App 516, 521-22, 575 P3d 177 (2025) (concluding that using a camera

---

[3] Because the camera here did not see beyond the exterior of the house and what was otherwise visible to the public eye, we do not address whether it would be a search were the cameras able to see the interior of the house or other parts of the property that were shielded from public view.

from a plane to zoom in on marijuana plants that otherwise were not visible to the "naked eye" constituted a search, but noting that use of technology to record what is openly visible is permissible).

Nor did the camera capture information that amounted to pervasive surveillance. Courts have used the term "pervasive" in the context of capturing a person's movements across a broad spectrum of activities. In contrast to a radio transmitter or collection of real-time cell phone location data, the pole camera allowed officers to see defendant coming and leaving the house. The camera could not continuously track his movements and location after he was out of the camera's line of sight. Although the camera's surveillance was constant, inasmuch as it was pointed at the home for a month, the information that it captured was quite limited in nature. *See also Combest*, 271 Or App at 52-53 (the computer technology "did not allow the 'pervasive and constant examination of [the defendant's online activity] throughout his daily life'" and thus did not constitute a search).

Defendant nevertheless asserts that the surveillance was pervasive, inasmuch as "ordinary social norms indicate that the continuous pole camera surveillance significantly invaded defendant's privacy." *See State v. Howard/ Dawson*, 342 Or 635, 642, 157 P3d 1189 (2007) (considering social and legal norms of behavior in assessing whether police conduct constituted a search). We question whether that premise is true, given the proliferation of doorbell cameras, video recording features on smart phones, and other types of cameras that are continuously capturing people's actions and whereabouts in public. To be sure, as the trial court noted, the conduct here was "intrusive." And many people understandably find it disquieting that so many of their public activities are likely to be captured on some form of camera without their consent. However, the fact that there is a genuine, growing concern about the societal normalization of near-constant public surveillance does not, under Oregon case law, mean that every public video recording conducted by police is a "search" for purposes of Article 1, section 9.

Finally, we agree with defendant that the Oregon Constitution is particularly protective of one's home and the

activities occurring therein. *See, e.g.*, *State v. Fair*, 353 Or 588, 600, 302 P3d 417 (2013) ("An ultimate objective of the constitutional protections, both state and federal, against unreasonable searches and seizures is 'to protect the individual in the sanctity of [their] home.'"). But it is not clear that that principle aids defendant here. Although an informant believed that the surveilled house was defendant's home, defendant stated below that it was not his home and a records check revealed that his address at the time of the surveillance was elsewhere. Additionally, officers saw defendant coming and going only 15 times over the course of a month, which suggests that the home the officers were observing with the pole camera was not defendant's residence. In light of that evidence, and in light of the fact that the camera did not allow officers to see *inside* of the home, we decline to afford any heightened degree of protection to the house at issue in this case.

C. *Fourth Amendment of the United States Constitution*

We turn to the Fourth Amendment, which provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated ***." Under that provision, when a government action infringes upon a reasonable expectation of privacy: that is, if "an individual seeks to preserve something as private and [their] expectation of privacy is one that society is prepared to recognize as reasonable, *** [governmental] intrusion into that private sphere generally qualifies as a search ***." *Carpenter v. United States*, 585 US 296, 304, 138 S Ct 2206, 201 L Ed 2d 507 (2018) (internal quotation marks omitted).

The United States Supreme Court has not addressed the question of whether a pole camera that captures activity otherwise visible to the public constitutes a search.[4] But

_____

[4] Several federal circuit courts of appeals have addressed that question and have concluded that use of pole cameras in this manner does not implicate the Fourth Amendment. *See, e.g.*, *United States v. Tuggle*, 4 F4th 505 (7th Cir 2021), *cert den*, ___ US ___, 142 S Ct 1107 (2022); *United States v. Harry*, 130 F4th 342 (2nd Cir 2025); *United States v. Vankesteren*, 553 F3d 286, 291 (4th Cir), *cert den*, 556 US 1269 (2009); *United States v. Dennis*, 41 F4th 732, 740-41 (5th Cir 2022), *cert den*, ___ US ___, 143 S Ct 2616 (2023); *United States v. May-Shaw*, 955 F3d 563, 567-69 (6th Cir 2020), *cert den*, ___ US ___, 141 S Ct 2763 (2021).

the Supreme Court has concluded that people do not have a reasonable expectation of privacy in activity that occurs in public: "The Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares." *California v. Ciraolo*, 476 US 207, 213, 106 S Ct 1809, 90 L Ed 2d 210 (1986). That principle holds true even where officers are using technology that enhances what otherwise can be seen by the naked eye. *Dow Chemical Co. v. United States*, 476 US 227, 238-39, 106 S Ct 1819, 90 L Ed 2d 226 (1986) (holding that technology that allowed for an aerial view of an industrial plant did not violate the Fourth Amendment, even if "human vision is enhanced somewhat").

That said, where officers use technology to enable them to see what cannot otherwise be seen by the naked eye, they conduct a search. *Kyllo v. United States*, 533 US 27, 40, 121 S Ct 2038, 150 L Ed 2d 94 (2001) (when police use "a device that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a 'search' and is presumptively unreasonable without a warrant"). And the use of third-party records that document a person's cell-site location information also constitutes a search, because it creates a "detailed and comprehensive record" of "a person's physical presence compiled every day, every moment," over the period of time that the person carries the phone. *Carpenter*, 585 US at 309, 315. However, in concluding that collection of data constituted a search in *Carpenter*, the Court emphasized that its decision did not call into question "conventional surveillance techniques and tools, such as security cameras." *Id.* at 316.

Here, defendant had no protected privacy interest in the exterior of the house and the walkway and road in front of it. The officers neither used technology that allowed them to see what otherwise could not be seen by a member of the public, nor did they collect a "detailed and comprehensive record" of defendant's every movement. As discussed above, the pole camera, which was placed in a public location, captured only a small snapshot of the house, a snapshot that could be seen by anyone in the vicinity. It also did not track

defendant once he left the house, as it captured defendant only when he came to and left the house. And officers did not physically trespass onto the property, inasmuch as the camera was mounted on a public telephone pole. *Cf. Jones*, 565 US at 404-05 (officers effectuated a search when they attached a GPS device to the defendant's car because their conduct amounted to a physical trespass onto the defendant's property).

Thus, the use of the pole cameras in this case did not constitute a "search" under the Fourth Amendment, and the trial court correctly denied the motion to suppress.

## II.   MOTION TO SUPPRESS EVIDENCE DERIVED FROM WARRANT

In his second claim of error, defendant challenges the denial of his motion to suppress evidence that officers found in the house pursuant to a search warrant. Defendant argues, as he did below, that the information in the affidavit was stale and that its terms were not sufficiently particular.

We review a trial court's denial of a motion to suppress for errors of law and are bound by the court's factual findings if there is constitutionally sufficient evidence to support them. *State v. Hargrove*, 327 Or App 437, 443, 536 P3d 612 (2023). A presumption of regularity arises when a search is warranted, and defendant bears the burden of proving the unlawfulness of a warranted search. *Id.* In resolving a challenge to a search warrant, we look at "the totality of the circumstances presented in the affidavit, \* \* \* and we resolve doubtful or marginal cases in favor of the preference for warrants[.]" *State v. Miser*, 303 Or App 347, 352, 463 P3d 599, *rev den*, 366 Or 827 (2020) (internal quotation marks and citations omitted).

We state the uncontroverted facts as recited in the affidavit supporting the request for the search warrant. *State v. Burnham*, 287 Or App 661, 662, 403 P3d 466 (2017), *adh'd to as modified on recons*, 289 Or App 783, 412 P3d 1233 (2018).

In February 2020, Officer Derry applied for a search warrant for the Baldwin Street house. He sought

authorization to search and seize items related to four bur-
glaries of marijuana dispensaries and grow sites that had
taken place in Oregon and Washington over the course of
several years, beginning in 2017 and continuing up through
January 2020. Derry explained in his application that he
had received information that a man named Arevalo had
reached out to police with information about one of the bur-
glaries. Derry interviewed Arevalo "within the last 30 days"
before submitting the search warrant affidavit. During the
interview, Arevalo told him that he began working at the
house on Baldwin Street in late 2019, trimming marijuana
plants. Arevalo had pictures and video of the inside of the
home that showed hundreds of pounds of dried marijuana.
While working in the home, he also saw stacks of cash, a
safe, a handgun, and pre-packaged marijuana bags. Arevalo
described the gun as a revolver that defendant called a
"throw away gun." One of the other people who worked at
the house, named Real, admitted to Arevalo that he had
been involved in a burglary at a marijuana dispensary in
Kelso. Real and Arevalo went on a ride in a GMC Denali
and Arevalo saw a ski mask inside the center console, which
Real told him he had worn during some of the burglaries.

Arevalo believed that defendant organized and
directed the burglaries and described to Derry that defen-
dant would research marijuana dispensaries in Oregon and
Washington that he believed would be good targets. The
people committing the burglaries used defendant's white
Chevrolet van to travel to the targeted dispensaries, used
two-way radios to communicate, wore flashlights on their
heads to enable them to see in the dark, and used masks to
shield their faces.

Derry also spoke with Winner, the president of one
of the dispensaries that had been burglarized. Winner said
he had received an anonymous letter from a person who said
that they had overheard a conversation about the burglary,
and that they overheard the names of several people who
lived on Baldwin Street, including defendant's name.

Derry learned from the Oregon Liquor Control
Commission that defendant was not a registered mari-
juana grower and that the Baldwin Street house was not

a registered address for a marijuana grow site. Using the Law Enforcement Data System (LEDS), Derry also learned that defendant is a convicted felon. Derry then surveilled the house and saw defendant coming and going from the house over 15 times within the 30 days prior to submitting his warrant affidavit. The surveillance footage had also captured a white Chevrolet utility or passenger van and a GMC Denali in front of the Baldwin Street house. Derry learned that a white Chevrolet utility van had been seen driving in the vicinity of a different burglary in Eugene in January 2020. That van was particularly distinctive because it was extra-long and had a black "RV style vent" and "utility light rack" attached to it. Derry compared photos of the van that was seen near the Eugene burglary with the van he had seen in front of the Baldwin Street address, and they were "an exact match." The van was registered to defendant.

Based on the information in Derry's affidavit, a magistrate issued a warrant for the Baldwin Street house. The warrant granted officers authority to search for a number of items, including masks, headlamps, drug paraphernalia, "money/US currency," checks, the contents of a safe, drug records, weapons, and "all items of profit or proceeds of the trafficking of controlled substances, (marijuana) from the theft of items taken during" the burglaries.

Defendant moved to suppress the evidence found as a result of the warrant. He argued that the information that Derry relied on was stale, inasmuch as it was based on Arevalo's observations that he made several months before Derry applied for the warrant. Defendant also argued that the phrase "all items of profit or proceeds" was insufficiently particular because it did not provide officers with guidance on how to distinguish between items that derived from marijuana trafficking versus other sources.

The trial court denied the motion to suppress. As to staleness, it found that the burglaries started in 2017 and continued until January 2020, indicating "continued activity where there [were] drugs being stolen." It noted that Derry had information about events in November and December, supported by pictures and video, and other corroborating information, including his observations of a "distinctive"

white van at the house that was connected to the Eugene burglary. And based on that "pattern of criminal activity" that continued up until January, the month preceding Derry's search warrant application, the court concluded that the information was not stale.

As to the lack of particularity, the court noted that the affidavit was "actually pretty specific[.]" Given the laundry list of items preceding the phrase "all profits and proceeds," "a realistic and commonsense reading of that" phrase was that it referred to items related to the burglaries.

A.   *Staleness*

On appeal, defendant reprises his arguments as to the validity of the warrant. We disagree with his argument that the trial court erred in concluding that the information in the affidavit was not stale. To be sure, if an affidavit contains information about past events and circumstances, we must determine "whether, given the time between the event described [in the affidavit] and the issuance of the warrant, there is a reasonable inference that the evidence will be where the affidavit suggests." *State v. Gustafson*, 300 Or App 438, 446, 452 P3d 962 (2019), *rev den*, 366 Or 493, *cert den*, ___ US ___, 141 S Ct 858 (2020) (internal quotation marks omitted). Relevant factors include the length of time between the events and the warrant's issuance, "perishability" of the evidence, the mobility of the evidence, the propensity of an individual suspect "to maintain and retain possession of" the evidence, and whether there is evidence that criminal activity is ongoing. *Id.* at 446-47; *State v. Arana*, 165 Or App 454, 458-59, 998 P2d 688 (2000) (relying on the ongoing nature of the criminal activity to determine that information in the affidavit was not stale).

We agree with the trial court that the information in the search warrant affidavit was not stale. The affidavit includes information of one burglary occurring as recently as January 2020, shortly before Derry sought the search warrant. Derry also saw defendant at the house on 15 occasions within 30 days of applying for the search warrant, and he observed two cars associated with the burglaries and suspects within that same time frame. Although defendant

points to the fact that Derry recounted Arevalo's statements of events that occurred in November and December 2019, that does not necessarily render the information stale, particularly in the context of this case. *See Arana*, 156 Or App at 458 ("Although the length of time is relevant to the determination of probable cause, its probative value is considered in light of all of the presented facts."). Although Arevalo personally witnessed certain events in that time frame, he also provided information related to criminal activity that had been occurring with relative regularity since 2017 and up through January 2020. Those facts show that the information was not stale.

B.  *Particularity*

We turn to defendant's argument that the warrant was insufficiently particular. The purpose of the particularity requirement is to "guide the officer to the thing intended to be seized and to minimize the danger of unwarranted invasion of privacy by unauthorized seizures." *State v. Tidyman*, 30 Or App 537, 542-43, 568 P2d 666, *rev den*, 280 Or 683 (1977). "The objective is that the search be as precise as the circumstances allow and that undue rummaging be avoided." *State v. Massey*, 40 Or App 211, 214, 594 P2d 1274, *rev den*, 287 Or 409 (1979). The particularity requirement consists of two distinct concepts: specificity and overbreadth. *State v. Friddle*, 281 Or App 130, 137, 381 P3d 979 (2016). A warrant must be specific enough to allow an officer, with reasonable effort, to identify the place to be searched and the items to be seized. *State v. Blackburn/Barber*, 266 Or 28, 34-35, 511 P2d 381 (1973). The warrant also may not authorize a search broader than what its supporting materials provide probable cause to justify. *State v. Reid*, 319 Or 65, 71, 872 P2d 416 (1994).

Here, as noted above, defendant argues that because the warrant granted officers permission to search for "all items of profits or proceeds of the trafficking of controlled substances (marijuana)," the warrant was insufficiently particular. Again, we disagree. As the trial court noted, the warrant and affidavit must be read in a commonsense, nontechnical manner. *State v. Miller*, 254 Or App 514, 516-17, 295 P3d 158 (2013) (citing *State v. Wilson*, 178 Or App 163,

167, 35 P3d 1111 (2001)). The phrase in the warrant that defendant contends lacks particularity did not stand in isolation; it followed a list of more particular descriptions of what officers were searching for, including "money/US currency," checks, and large quantities of marijuana. And the phrase itself is particular, as it did not permit the officers to search for "any items of profit or proceeds"; it limited officers to those profits or proceeds related to "the trafficking of controlled substances, (marijuana) from the theft of items taken" during the burglaries. This case thus bears little resemblance to ones in which courts have concluded that the search commands have been insufficiently particular. *E.g.*, *State v. Ingram*, 313 Or 139, 831 P2d 674 (1992). Thus, the trial court was correct in finding that the warrant was sufficiently particular and in denying the motion to suppress.

Affirmed.